## Staunton.

### B. R. WILLIS, ET ALS. V. THE BLUE RIDGE BANK, INC. ET ALS.

September 19, 1929.

Absent, West, J.

The opinion states the case.

*Thos. Whitehead, L. H. Shrader, Edward Meeks, B. G. Howard,* and *Henson & Henson,* for the appellants.

*Jno. W. McCauley, G. W. Agnew, W. D. Tompkins* and *J. E. Proffit,* for the appellees.

HOLT, J., delivered the opinion of the court.

This is a suit brought to set aside a conveyance of real estate charged to have been fraudulent.

S. P. Willis, a citizen of Floyd county, died there about fifteen years ago leaving to survive him his widow, Emma V. Willis, and three children, namely, a daughter, Bessie, who married L. H. Shrader, a daughter, Martha, who married Mr. Rutrough, and an infant son, Bennett Riner Willis.

Decedent's estate was duly administered in a suit brought for that purpose. Lands were sold, and Mrs. Willis was appointed receiver for this infant. In that suit she purchased what is known in the record as the Barnhart land, giving therefor $4,680.00. The deed to her from court commissioners bears date November 14, 1917, and describes the property as containing 146 acres. Of the purchase price $468.00 was paid in cash, and as evidence of the balance due she executed her three bonds, each for $1,404.00, due in one, two and three years.

By deed of date June 28, 1922, Mrs. Willis conveyed this property to her son, Bennett Riner Willis. The consideration there expressed is $3,000.00 cash in hand paid. On the 31st day of July, 1923, Bennett Riner Willis sold it to his sisters, Bessie Willis Shrader and Martha Willis Rutrough, for "four thousand dollars, of which amount thirteen hundred and two dollars and interest thereon in a note made by the party of the first part payable to Bessie W. Shrader and six hundred and fourteen dollars and interest thereon is represented by a note made by B. R. Willis payable to Martha W. Rutrough and the said parties of the second part having advanced other sums of money to the said B. R. Willis in the sum of fifteen hundred dollars, and the amount of the cash now paid making a total of four thousand dollars." The validity of this deed is the major issue here.

On the same day, July 31, 1922, Emma V. Willis conveyed to these daughters her interest in her husband's estate, the consideration being: "The sum of fourteen hundred and ninety-seven dollars and interest thereon, being a debt due to the parties of the second part by the said Emma V. Willis, and the said parties of the second part agreeing to assume the payment of

one note for the sum of one thousand dollars due to the First National Bank of Radford, Virginia, by Emma V. Willis, and another note for the sum of one hundred dollars due to the People's Bank of Floyd county, Virginia, by the said Emma V. Willis.''

At the date of these last two conveyances Bennett Riner Willis was indebted to the Blue Ridge Bank in the sum of $4,735.07, evidenced by notes endorsed by him. Of these a $400.00 note had become due on the 24th of July, 1923, and another $400.00 note on the following day, July 25th. The remaining notes fell due in a short time thereafter. Just before the deed of July 31st was executed, the bank, which was dissatisfied with the status of this indebtedness, asked B. R. Willis to secure it by deed of trust on the Barnhart property. This Willis declined to do and at that time assigned as a reason for his refusal the fact that he needed this property as a source of credit necessary for the completion of his education. On this occasion the bank acted through its cashier, Ethelbert Weeks. Willis, however, did agree to meet the bank's loan committee. A committee meeting was called but Willis did not come.

The trial court makes this statement, amply supported by evidence, of what he actually did: "That immediately thereafter he had a conference with his relatives by blood and marriage, as a result of which he and his mother divested themselves of all of their estate and vested the same in his sisters in the same transaction, thereby putting his entire estate beyond the reach of the complainant, his creditor."

He went, however, not to meet the bank's committee, but immediately to Amherst, Virginia, to consult L. H. Shrader, an attorney and the husband of one of the grantees, his sister. He and Mr. Shrader then went

to Willis, Virginia, and from Willis, B. R. Willis and his mother went to Floyd Courthouse, where the deed in judgment and the deed from Emma V. Willis to the same grantees were placed upon record.

The deed from the son conveys the Barnhart land and his reversionary interest in his father's estate, which was all he had with the exception of some stock in the Blue Ridge Bank, transferred by him to L. H. Shrader either on July 31st or August 1st. It bears upon its face intrinsic evidence of haste. The dates of the notes which it purports to pay are not given, nor are the dates of loans claimed to have been made. It is not possible to say just what interest was due on these different items. A possible reason for this is that the bank was at that time preparing papers for an attachment, hence the necessity for prompt action.

■■ W. H. Willis, sometimes referred to as "Uncle Henry," was also an endorser on these bank notes. Mr. Shrader went to see him about August 2nd. This is Mr. Willis' account of what occurred on that occasion: "About the second day of August, I think it was, pretty sure it was on the 2nd day of August or about that time, I was at Willis' store. Mr. Shrader took me in the office room of the store and told me that Mrs. Willis and Riner had deeded their property to Bessie and Martha. I asked him what I would do, were they going to throw all their indebtedness upon me to pay? He then suggested that I do likewise, that I deed my property to my wife or my boys, then he said we would have them so they could not make it out of either party, referring to the bank. I told him that I could not do that; that I did not think it was right."

It is said that this evidence is incompetent, since in any event it is but the statement of a conspirator after the conspiracy is accomplished. This general proposi-

tion of law is elementary but when the incident is so closely connected with the major purpose of the parties as to form a part of the *res gestae*, it is admissible. 5 R. C. L., page 1089.

There is evidence tending to show that Mr. Shrader went with B. R. Willis to Floyd county in connection with the deed in judgment. That deed was written on July 31st. It follows that he must have gone to see W. H. Willis immediately upon his return to Willis, for this interview took place on August 2nd. Shrader then urged Willis to take like action and so this evidence becomes competent upon the theory that it is part and parcel of one transaction to defeat the bank in its attempt to collect its debt.

The deed from Mrs. Willis to her daughters and the deed from the son to his sisters were both executed and recorded at the same time. They also were part of one transaction. On September 17, 1923, Mrs. Willis, in a letter to Mrs. James A. Poff, in explanation of the motives which controlled her conduct, said: "We only wanted to fix it so they (the grantees) could have the arrangement of it and do the selling or renting as shall be necessary." Later she asked W. H. Willis to come to see her. He came. She told him "her reasons for transferring her property to her daughters; they were to keep the bank from tying it up so they could sell it or dispose of it themselves."

Objection is made to this evidence also. It is inadmissible to prove the conspiracy, but it is competent "for the purpose of illustrating the motive, and intent of the associates in crime." 1 R. C. L., page 520. Of course, the plaintiffs claim that it was all part of one purpose which was to defeat the bank.

Later, B. R. Willis and L. H. Shrader tried to sell this Barnhart land to a Mr. Slusher. Another signifi-

cant fact is that B. R. Willis has not seen fit to testify in this suit.

For the defendant it is said that Emma V. Willis bought this property as an original proposition, not for herself, but for her son.

At the October term, 1916, of the Floyd county Circuit Court, she filed her petition as receiver in which she stated "that there has been and will be coming into her hands as such receiver some $4,000.00 for Bennett Riner Willis. * * * Your petitioner further presents that it would be to the best interest of Bennett Riner Willis to have his money invested in this Barnhart place to the extent that his money will pay for the same." The court by its decree approved this suggestion and authorized and directed her to make such investment of her receivership trust funds.

It is contended that the funds from this source were not sufficient to pay for this land and that the mother was obliged to borrow from her daugher, Mrs. Shrader, for that purpose, $1,302.89, and from her daughter, Mrs. Rutrough, $614.00. There is no documentary evidence in the record to support these claims. If there came into her hands from her husband's estate for her son approximately $4,000.00, it was not necessary to secure from outside sources any such sum; but if it were necessary, and if she had in fact borrowed this money for this purpose, we would naturally have looked for some settlement when the deed of June 28, 1922, from her to him was written. The consideration there expressed is $3,000.00 in cash. If any such sum was paid, then the presumption is that she received enough and more to cancel all money borrowed to pay for her purchase. If she as receiver had $4,000.00, and if she was paid by her son $3,000.00 in addition, then there came into her hands about $7,000.00. The

original purchase price was $4,680.00. Her claim now is that $3,000.00 was not the real consideration, and on direct examination she said:

"Well, I still owed this money to the girls that I had borrowed from them and given them notes for, and hadn't paid it; hadn't paid any interest or anything; then he assumed those notes, he assumed the payment of those notes when the land was deeded to him, and in that way just relieved me from all responsibility. I had to use their money, and then he assumed those debts after he became of age and took the land. I deeded it to him."

If we assume that these two notes became the valid obligation of B. R. Willis, there is nothing in the record to show that they were ever surrendered or cancelled. On the other hand Willis in his bankruptcy proceeding testified that the $1,302.00 note was at that time held as collateral in a Roanoke bank for money borrowed by his sister. Just how a note, which this sister claimed had been paid in this way, could still be used by her as collateral, is not clear.

Appellants contend that there only came into the hands of the mother, as receiver for her son, $1,896.05. Certainly this much came. Whether or not more came we cannot say for the receiver never made any final settlement. This does appear: The father's estate was considerable; the fee simple value of lands assigned as dower was about $10,000.00, while the mother and her counsel, a year after the suit had been instituted, estimated the son's interest to be approximately $4,000.00.

The evidence as to the $1,500.00 item, which purports to have been also a part of the consideration for the conveyance of July 31, 1922, is still more conclusive. The claim is that it was advanced at the urgent

request of the mother by these sisters to aid their brother in completing his education. In the petition for appeal it is said: "In order to carry out this purpose under the urgency of their mother his two sisters loaned him $748.00 each."

The trial court, in the course of its opinion, makes this satisfactory statement relative to it: "The grantees and Mrs. Willis all testify that this $1,500.00 represents two items of $748.86 each, evidenced by two notes made by Mrs. Willis and payable to Mrs. Shrader and Mrs. Rutrough, respectively, which were the interests of the grantees in their father's mercantile business, which she owed them and which B. R. Willis had assumed. There is no evidence in the record showing that Mrs. Willis ever borrowed any money from her daughters except the items which are the consideration for the conveyance sought to be set aside. At the beginning of the deposition for complainant there is filed as an exhibit the deed from Mrs. Willis to these two daughters, a part of the consideration of which is a debt of $1,497.00 and interest. This debt is the same in the aggregate amount as the two notes evidencing the $1,500.00 debt owed by the same debtor to the same creditors. Furthermore, Mr. L. H. Shrader, counsel for the defendants, admits in his brief that this $1,497.00 was due Mrs. Shrader and Mrs. Rutrough for their part of the merchandise in the store of their father, which was taken over by Mrs. Emma V. Willis and for which she executed her notes."

Upon this evidence the trial court was "of opinion that the consideration mentioned in said deed to Bessie Willis Shrader and Martha Willis Rutrough from Bennett Riner Willis was fictitious and fraudulent."

What weight is to be given to its judgment?

In *Swetnam* v. *Antonsanti,* 150 Va. 534, 143 S. E. 716, 719, we dealt with this subject and said: "In *White* v. *Reed,* 146 Va. 254, 135 S. E. 809, Judge Prentis said: 'The burden which is cast upon the appellant in this court is not merely to lodge a doubt, but to satisfy this court of the error assigned. It would be going too far, perhaps, to say that error must be demonstrated, for that might be construed to imply mathematical precision, but certain it is that an opinion reversing a judgment should convince the impartial mind.' In *Kiser* v. *Hannah,* 148 Va. 599, 139 S. E. 279, the above doctrine is approved."

No argument is needed to show the purpose of B. R. Willis. It is true that when the grantees are innocent and the consideration is adequate, fraudulent intent on the part of the grantor is not sufficient, but the burden of showing value is upon the grantees when the grantor's fraudulent purpose has been made to appear. *Dudley* v. *Buckley,* 68 W. Va. 630, 70 S. E. 376; *Hickman's Ex'or* v. *Trout,* 83 Va. 478, 3 S. E. 131. This burden they have not borne.

To undertake to review all of those cases in Virginia which treat of this subject would be a thankless task.

Fraud is not to be presumed but must be proven by those who charge it, and the evidence must be clear, cogent and convincing, (*Baldwin* v. *Winfree's Admr.,* 116 Va. 16, 81 S. E. 36)—a proposition reiterated in countless cases.

Relationship is no badge of fraud. Those connected by blood or marriage may deal freely with each other as strangers might, but when fraud is charged and when the evidence is largely circumstantial, circumstances which among strangers would be comparatively unimportant must be closely scrutinized

wherever this intimate relationship is shown to exist. A failure to give weight to such circumstances would be to go counter to common experience. *Johnson* v. *Lucas*, 103 Va. 36, 48 S. E. 497.

■■ In the nature of things, evidence to sustain charges of fraud like this is often of necessity circumstantial. Questionable dealings are not usually done in the limelight, and outside witnesses are seldom present. When we remember the relationship of the parties, the insolvency of the grantor, both Mrs. Willis and Bennett Riner Willis having gone into bankruptcy, the attempt which Mr. Shrader made to have W. H. Willis take like action, the purpose which Mrs. Emma Willis had in mind as shown by her letter, her statement to W. H. Willis, B. R. Willis' efforts to effect a sale of the land after its conveyance to his sisters, all in the face of known active efforts of the creditor to protect itself, together with the character of the indebtedness set up to support the conveyance, we have no difficulty in reaching the conclusion that the trial court was warranted in finding that this deed was made with intent to defraud. We would have to be more than ordinarily credulous to believe that the grantees are its innocent beneficiaries.

When the trial court had reached the conclusion that the deed of July 31, 1923, was fraudulent and void, it went forward and gave judgment against B. R. Willis personally as follows:

"It is, therefore, considered by the court that the complainant recover of the defendant, B. R. Willis, the sum of $4,735.07 with interest on $400.00 from July 24th; $400.00 from July 25th; $788.83 from August 11th; $900.00 from August 27th; $390.00 from September 10th; $900.00 from September 11th; $756.24

from September 23rd; and $200.00 each from September 23rd, 1923, with $5.00 attorney fee on each of said notes."

This is not a matter of prime importance. It will be wiped out by a discharge in bankruptcy. For practical purposes it establishes the plaintiff's debt and does nothing more.

"Whether a judgment rendered against a bankrupt on a provable debt, after the commencement of proceedings in bankruptcy, but before his discharge and when he has interposed no defense, continues to bind him and his after acquired property, or he is discharged by his discharge in bankruptcy, is the subject of much conflict of authority, but it is believed that upon reason and the weight of authority the judgment is discharged." Burks Pleading and Practice (2d ed.), section 200.

This suit was instituted on December 3, 1923. On December 29, 1923, B. R. Willis filed his petition in bankruptcy and was adjudicated a bankrupt on December 31, 1923, and in this suit the trustee in bankruptcy, as has been seen, afterwards intervened.

The trial court then referred the cause to a commissioner with orders to convene the creditors of B. R. Willis and to state their claims in the order of their legal priorities. All of this appellants say is wrong, and contend that even if the deed of July 31, 1923, be in fact fraudulent and void, the assets so uncovered should be turned over to the bankrupt court for administration.

In *Eyster* v. *Gaff*, 91 U. S. 521, 23 L. Ed. 403, Mr. Justice Miller said: "It is a mistake to suppose that the bankrupt law avoids of its own force all judicial proceedings in the State or other courts the instant one of the parties is adjudged a bankrupt. There is nothing in the act which sanctions such a proposition.

"The court in the case before us had acquired jurisdiction of the parties and of the subject-matter of the suit. It was competent to administer full justice, and was proceeding, according to the law which governed such a suit, to do so. It could not take judicial notice of the proceedings in bankruptcy in another court, however seriously they might have affected the rights of parties to the suit already pending."

*Moore* v. *Green* (C. C. A., 4th Cir.), 145 Fed. 472, 475, 477, 16 Am. Bank. Rep. 648, is an important and instructive case. It there appears that George Porterfield, a farmer, filed his voluntary petition in bankruptcy on the 10th of November, 1902, and was adjudged a bankrupt on the 12th of November, 1902. Prior thereto and on the 11th day of June, 1902, he executed a trust deed upon his real estate to secure a debt of $12,500.00 in which his wife joined, and on the 13th day of the same month he executed a second trust deed to secure to his wife $4,976.73. On the 11th and on the 13th day of June he was insolvent. This his wife neither knew nor had cause to know. The district court proceeded with the bankruptcy case and took over the Porterfield farm mortgaged as aforesaid, which it subsequently sold for $19,420.50. After the execution of the deed of the 13th day of June in favor of Mrs. Porterfield, one of Mr. Porterfield's creditors, on the 30th day of August, 1902, brought suit in the State court to set aside the deed to secure Mrs. Porterfield, and charged that it contained a preference forbidden by section 2, chapter 74, of the Code of West Virginia, of the year 1899. That Code provision declares that creditors instituting such proceedings and other creditors who come in on the usual terms shall be entitled to have their claims paid in full if possible out of properties so recovered in preference to other creditors

of such debtor. Judge Waddill said that the case turned upon the effect of the institution and pendency of the suit in the State court, and that two questions were presented, namely:

"What was the proper course for the district court to pursue in dealing with the case before it, so far as the litigation pending in the State court was concerned?; and, secondly, what was the legal effect of the proceeding in the State court?"

Relative to the first he said: "As to whether the relief to which the petitioner herein is entitled should have been afforded him by proceedings in the bankruptcy court, or that court should have suspended its administration so far as the portion of the assets of the bankrupt is concerned, properly applicable to the lien of the deed of the 13th day of June, 1902, in favor of Mrs. Porterfield, is largely a matter of discretion in the view we take. Either course could have been adopted. No question of jurisdiction was involved. The bankruptcy court clearly had jurisdiction to proceed, and, if needs be, to have stayed the prosecution of the suit in the State court for the time being; but the State court, likewise, at the time of the institution of the suit therein and the commencement of the bankruptcy proceedings, had and still has jurisdiction, and we think, as a matter of convenience, aside from any question of comity, the better plan would have been and is to proceed with the litigation in the State court, to the end that all creditors who may desire to do so may appear therein and assert their rights to such fund, and in the meantime the bankruptcy proceeding would as to that portion of the estate remain in abeyance; the bankruptcy court carrying out the judgment of the State court, when duly informed thereof, in said proceeding. No inconvenience would arise from this except as to

this part of the fund. The bankrupt's discharge need not be withheld. Creditors have the right to assert their claim of lien irrespective of discharge; and but for the fact of its being optional with them to appear in said suit, it would really be better for the trustees in bankruptcy to interpose therein in their behalf."

From this it follows that no error has been committed up to this point, but it is said that the lower court, in giving preference to the bank's claim, has violated a plain provision of the bankrupt law (H. U. S. C. A.).

A complete answer to this is that no such preference has been given. If it exists, it arises out of the fact that this suit is a proceeding under our State statute, section 5186 of the Code 1919, and not out of the court's order. Not until the court has undertaken to give such a preference can any appeal be taken from its judgment. We can neither affirm nor overrule the trial court until it acts.

For other reasons appellants have no standing. In their answers, the claim is made that B. R. Willis was indebted to them, and that this indebtedness was cancelled and paid by the delivery of the deed of July 31, 1923. The trial court was of opinion that the consideration there named was fictitious and fraudulent. Its conclusion is justified by the record. It follows that these appellants have no further interest in this litigation, nor can they be now heard to say that "our indebtedness is not paid, but we are common creditors of the bankrupt and entitled to all their rights." *C. & O. Ry. Co.* v. *Rison,* 99 Va. 18, 37 S. E. 320.

Again, the trustee in bankruptcy appears to be satisfied with all that has been done up to this time. Certainly he has made no complaint nor has he been asked to take action of any kind. It is true that a

general creditor may compel him to act or the objecting creditor may act in his name, but something must be done before his conduct can be overborne. *In re Stern* (C. C. A., 8th Cir.), 16 Am. B. R. 510, 144 Fed. 956; Collier on Bankruptcy (13th ed.), Vol. 2, section 47.

We find no reversible error in the decree appealed from.

*Affirmed.*