STATE OF WEST VIRGINIA

*v.*

JAMES EDWARD SIMON

(No. 10003)

Submitted January 18, 1949. Decided February 15, 1949.

*Riley, Judge,* dissenting.

*James H. Rowland,* and *H. E. Dillon, Jr.,* for plaintiff in error.

*Ira J. Partlow,* Attorney General and *W. Bryan Spillers,* Assistant Attorney General for defendant in error.

324

Fox, Judge:

On March 17, 1947, in the Criminal Court of Raleigh County, an indictment was returned against W. A. Thornhill, Jr., William Henry Lilly and James Edward Simon, charging them with tampering with certain ballots cast in the general election held in said county on November 5, 1946. Said indictment was apparently based on the provisions of Article 7, Chapter 3 of the Code, especially sections 1 and 9 thereof. The defendant, James Edward Simon, appeared on March 28, 1947, and interposed his demurrer to the said indictment, which demurrer was, on March 31 following, overruled. The demand of the said defendant for a separate trial was sustained by the court, and he entered his plea of not guilty to the said indictment, and the case was tried, as to him, the trial opening on said day. At the end of the introduction of the State's testimony, the State was required to elect upon which count of the indictment it would rely for conviction, and elected to so rely on the second count thereof. On April 4, 1947, the jury returned a verdict in the following language: "We, the jury, find the defendant, James Edward Simon, guilty as charged in the within indictment." On the same day a motion was made to set aside the said verdict and grant defendant a new trial, on the ground that the same was contrary to the law and evidence, and for reasons to be later assigned. On April 23, 1947, the said motions were renewed and grounds therefor assigned. On June 21, 1947, the motion to set aside the verdict was overruled, and the defendant was sentenced to confinement in the penitentiary of this State for a period of not less than one nor more than ten years. Objections were made to the action of the court in refusing to set aside the verdict, and in imposing sentence, and due and proper exceptions taken at the time. On refusal of a writ of error by the Circuit Court of Raleigh County, we granted such writ on September 29, 1947.

The first count in the indictment charges that the said defendant did:

"* * * unlawfully and feloniously open without breaking, break open and violate the seals and locks of certain ballot boxes, papers, envelopes and bags, the property of and in the possession, custody and control of Harry Anderson, Clerk of the County Court of Raleigh County, West Virginia, and H. G. Farmer, J. J. Shrewsbury and D. B. Jarrell, Commissioners of said Court, and as such Ex-Officio the Board of Canvassers of election returns in said County in which said ballot boxes, papers, envelopes and bags there were ballots deposited at and after said election, which said ballots were cast by the qualified voters of said County at said election, they, the said W. A. Thornhill, Jr., William Henry Lilly and James Edward Simon, not being duly authorized by law so to do * * *."

The third count of the said indictment alleged that the said defendant did:

"* * * unlawfully and feloniously obtain possession of certain ballot boxes, papers, envelopes and bags".

the property and in the possession of the same persons, and:

"did unlawfully, feloniously and fraudulently make certain erasures and alterations upon the tally sheets, poll books, list of voters and the election returns deposited therein, they, the said W. A. Thornhill, Jr., William Henry Lilly and James Edward Simon, not being duly authorized by law so to do * * *."

The second count of the indictment, upon which the State relied for conviction, was in the words and figures following.

"And the Grand Jurors aforesaid, upon their oaths aforesaid, do further present that the said W. A. Thornhill, Jr., William Henry Lilly and James Edward Simon, on the 16th day of November, 1946, in the said County of Raleigh, and within twelve (12) months from and after

the closing of the polls on General Election Day, November 5, 1946, did unlawfully and feloniously obtain possession of certain ballot boxes, papers, envelopes and bags, the property of and in possession, custody and control of Harry Anderson, Clerk of the County Court of Raleigh County, West Virginia, and H. G. Farmer, J. J. Shrewsbury and D. B. Jarrell, Commissioners of said Court, and as such Ex-Officio the Board of Canvassers of election returns in said County, in which said ballot boxes, papers, envelopes and bags there were ballots deposited at and after said election, which said ballots were cast by the qualified voters of said County at said election; and said W. A. Thornhill, Jr., William Henry Lilly and James Edward Simon did unlawfully and feloniously cancel, withhold and destroy said ballots, they, the said W. A. Thornhill, Jr., William Henry Lilly and James Edward Simon not being duly authorized by law so to do, against the peace and dignity of the State."

The offense charged in the indictment was alleged to have been committed very early in the morning of the 16th day of November, 1946. Later, about 9 o'clock on the morning of said day the defendant, James Edward Simon, was arrested and taken to the office of the prosecuting attorney of said county, where, in the presence of the said prosecuting attorney, the sheriff of the county, certain police officers and others, he made two statements which were reduced to writing and signed by him in the presence of witnesses, which statements are relied upon by the State as a confession of his participation in the offense alleged in the said indictment. The first statement so made by him was amplified later on the same day, after defendant had consulted with the then sheriff of Raleigh County. On December 19, 1946, the said Simon made a further statement to Claude H. Vencill and Robert L. Harper, special agents of the Federal Bureau of Investigation, which statement closely and substantially corresponds to the statements made by him on November 16, 1946, aforesaid. There is ample testimony in the record that these statements were made by him freely and voluntarily, without any compulsion what-

ever, and without any promises of leniency or other consideration which would induce the defendant to make the same. We think the State has fully sustained the burden, which rested upon it in cases of this character, to show that the statements relied upon as confessions, were voluntarily made. All of the said statements, relied upon as confessions, were introduced as evidence before the jury over the objections of the defendant. The record discloses that the State relied in particular on the second of the two statements alleged to have been made by the defendant on November 16, and for the purpose of clarifying the case we think we are justified in quoting said statement in full, and the same is in the words and figures following:

"My name is James Edward Simon. I am a janitor working in the Court House, and have a room in the basement where I live.

"During the Primary and General Election I was very active for Mr. W. A. Thornhill driving his car, advertising and campaigning for him, and he has paid me money in the past for doing so.

"On Sunday, November 10, 1946, Mr. Thornhill called me from his office by telephone, and asked me to come to his office in the Lawyers Building. I went over, and he and I talked privately in his private office. Mr. Thornhill wanted me to see that the window of the vault in the County Clerk's Office was left unlocked or in such fashion that I could get in and get certain ballot boxes for him. He told me that he would make it all right with me if I would do that. I refused at the time and finally left and went back to my room.

"On Monday, November 11, 1946, Mr. Thornhill again called me by phone and asked me to come to his office and I did so. He urged me again to agree to 'trip' the lock to one of the vault windows so that it could be raised and a person get in and out. I refused again, but at that time he gave me a yellow piece of paper on which he had jotted down in his handwriting

the numbers of certain precincts in Raleigh County, the ballots from which he wanted to get. I have since turned that yellow piece of paper over to Sheriff Lewis.

"Mr. Thornhill called me about this matter several times between November 11th and Thursday night, November 14th, and I actually went to his office on several occasions during that period with reference to this matter. On each occasion Mr. Thornhill again urged me to agree to what he had first requested me to do, but I did not agree.

"About seven o'clock Thursday night, November 11th, my sisters, Ruby and Christine Simon informed me that Mr. Thornhill had called a bit earlier and left a message that I get in touch with him. Ray McCray, a janitor at the court house told me the same thing. I therefore put in a telephone call from the Court House to Mr. Thornhill's office and he wanted to see me and it was agreed that I would get in contact with him after the football game, which I was going to attend that night. Mr. Thornhill let me have his car and I took my girl friend, Anna Abrams and Mary Gray to the football game in Mr. Thornhill's car and brought them back. I then took Mr. Thornhill's car back to where I had gotten it from and he called me from his office by telephone and asked me to come to his office. I went over, and Henry Lilly was there. Mr. Thornhill and Henry Lilly again urged me to see that the window was left open so that the ballots could be obtained, and Henry Lilly counted out and gave to me four $50.00 bills to pay me for accommodating them. Before he gave me this money he asked Mr. Thornhill if he should give it to me then, and Mr. Thornhill said 'yes, go ahead and give it to him now, and give him more if he wants it.' I still refused to do what they wanted me to, and Mr. Thornhill told me to go on, take the money and forget about it, that he would do it himself, and he then obtained a pistol from his desk and put it in his coat pocket, put on his overcoat and hat and Mr. Lilly urged Mr. Thornhill not to get the ballots that night, but to wait until Friday, that

he would think up some way to get them. I left the two men in the office and went back to my room.

"On Friday night, November 15th, Henry Lilly came to my room in the Court House where I was sleeping about nine-thirty. Later on Mr. Thornhill called from his office by telephone to me in my room and told me he would see me later on. Around about midnight or shortly before, Mr. Thornhill did come to the Court House and talked to me in the hallway in the basement and the furnace room. He had a pistol with him at the time and showed it to me and told me that I just had to get those ballots for him, that he was desparate and needed them and that he would shoot me if I didn't do it. From here we went down to the ground right beneath where the window was located, and Mr. Thornhill stood in the shadow of the bushes on the Court House lawn there, and with the gun in his hand insisted that I then break the pane of glass in the window. I picked up a rock and broke the pane of glass closest to the lock on the window. After that I hurried to my room in the basement leaving Mr. Thornhill there. Mr. Thornhill's car was parked on the Court House driveway near-by at the time. In about five or six minutes Mr. Thornhill came to where I was in the basement and took me with him to his office, where we both had a drink of liquor. After that I came back to my room in the basement and Mr. Thornhill left his office building and went to the corner of Heber and Prince Streets.

"About an hour and a half later Mr. Thornhill came to my room in the basement and asked me to go with him. We got in his car, which was parked with the motor running next to the entrance near the elevator, and we two drove down Prince St. to the alley behind Dr. Campbell's house, down that alley to the alley right behind the President Hotel and parked there. In parking there, Mr. Thornhill damaged a fender to another automobile that was parked there.

"A colored elevator boy by the name of Marshall let us in the basement rear door entrance

to the President Hotel, and at Mr. Thornhill's request I carried a cloth bag from the floor boards near the rear seat of his car into the hotel with us. We went up in the elevator to Room 311. Mr. Thornhill unlocked the door and I carried this bag in. Mr. Thornhill opened and dumped the contents of the bag, which contained four fairly large brown paper envelopes. Henry Lilly was in that room when we entered, seated on the bed, handling some ballots. Mr. Thornhill and Mr. Lilly both removed the staples that were used in sealing the four brown envelopes that we had carried there in the cloth bag, and a knife was used to separate the envelope itself from the flaps. Inside these envelopes were bundles of ballots, and Henry Lilly cut the strings and unloosed all those ballots and commenced changing them in some fashion with a pencil which he had. While Mr. Lilly was seated on the bed doing that, Mr. Thornhill remained seated with a yellow tablet and pencil, on which he was keeping a tabulation of figures given him by Mr. Lilly from the ballots.

"After we had been in that room about two or three hours, Mr. Thornhill tried to get the elevator boy, Marshall, to let us out of the hotel by the rear basement entrance. The boy would not do so and could not do so because he didn't have a key to the entrance at that time. Mr. Thornhill then called the desk clerk by phone and tried to get permission to leave by that rear entrance. We then got on the elevator and went to the basement, where the desk clerk, Mr. Hanger was. Since Mr. Thornhill had no automobile in the basement garage, the desk clerk would not let any of us out by the rear basement door. Mr. Thornhill and the desk clerk had considerable argument about leaving through the back entrance, but finally we were refused and we all three left there through the front entrance of the hotel. At the time, I was carrying the same cloth bag that I had carried in, with several of the fairly large brown paper envelopes which contained the ballots that had been changed by Henry Lilly and put back, stapled and sealed in the same envelope containers by both Mr. Lilly and Mr. Thornhill. I

had held some of the envelope flaps in place while they dropped the wax on them and sealed them.

"We went down the alley behind Watkins Drug Store and I put the cloth bag in Mr. Thornhill's car. Mr. Thornhill asked me to come and go with the two men in the car and drive the car, but I would not and left them here in the car and I came back to the Court House. I came out the alley behind Dr. Campbell's house and then up the alley beside his house, where I passed Eugene Scott and Azel Cook, who were standing either in the alley way beside Dr. Campbell's house or on the sidewalk in front. I came on over to the Court House and I later saw those two men come toward the Court House. In just two or three minutes Mr. Cook and Mr. Scott came to the door on the east side of the Court House, where Mr. Scott asked my name.

"About nine o'clock this Saturday morning, November 16th, Mr. Thornhill called me by phone from Charleston and asked me what was going on. I told him that things were getting pretty hot, and he persisted in talking and I hung up. I have not seen either Mr. Thornhill or Mr. Lilly since.

JAMES EDWARD SIMON.

JAMES EDWARD SIMON.

Witnesses:

(Signed)    MILLARD E. TYREE,

(Signed)    A. SCALISE,

(Signed)    C. C. LEWIS."

The State introduced evidence to corroborate the statement made by the defendant quoted above. Shortly after defendant was taken into custody, a search warrant was obtained authorizing the search of Room Num-

ber 311 in the President Hotel in the City of Beckley. The search revealed that in said room there were various papers, lists, envelopes, tabulations of votes, sealing wax, staples, all described as papers, machines and stationary used in connection with the election then lately held in said county, and they were identified as such. It was shown that Room Number 311 had been reserved for occupancy prior to November 16, 1946, and that on the night of November 15, 1946, it was occupied by persons who registered in the names of John NeSmith and John Ratton. One Marshall, an employee of the hotel, stated that the defendant, W. A. Thornhill, Jr., and John Henry Lilly were in said room that night, and that, after midnight, they carried to the room packages, the contents of which were not known to him, and that they remained in said room two or three hours; that when they left the hotel there was some dispute between one of said parties and the night clerk as to the manner of exit from the hotel. An attempt was made to identify W. A. Thornhill, Jr. as one of the parties there present by employees of the hotel, but this effort was not entirely successful, the nearest identification being that of a young lady who, being shown a picture, identified as that of W. A. Thornhill, Jr., gave it as her opinion that said Thornhill was present. It appears that during that night, the hotel night clerk's attention was called to what was happening in Room 311, and both he and Marshall overheard remarks in which the names of candidates on the ticket voted on in the then recent election were mentioned, resulting in the night clerk, Hanger, calling one Eugene Scott, who had been a candidate for the State Senate against W. A. Thornhill, Jr. in said election. Just why Hanger called Scott is not clearly indicated by the record. Whatever may have been his motive for said act, said Scott, and one Azel Cook, whom Scott had called, were soon in the vicinity of the President Hotel. Both of them say that they overheard a conversation taking place with some one in the hotel, and that they recognized the voice of W. A. Thornhill, Jr. as one of the parties engaged therein. A short distance from the

hotel they came in contact with the defendant, James Edward Simon, as he was leaving the hotel, and just a little later they recognized W. A. Thornhill, Jr. in an automobile at a point not far from the hotel, and again later near the court house of Raleigh County. It was shown that there were two persons in said automobile, but only Thornhill was recognized. Another witness recognized William Henry Lilly in a restaurant not far from the court house about midnight of November 15. When the defendant, Simon, was taken into custody he turned over certain of his belongings to some one around the court house, and on the afternoon of November 16, the prosecuting attorney and the sheriff took said belongings into their possession, and found the sum of $180.00 in cash among them. This fact is testified to by the prosecuting attorney, and the failure of the sheriff to testify on this point, as on other points in the case, is explained by the fact that at the time of the trial he was unable to testify by reason of a serious illness.

All of these happenings in and around the President Hotel, and around the court house were in the very early morning of November 16, 1946. The record discloses that the occupants of Room 311 in the President Hotel went to that room after midnight and remained two or three hours. Ballots and other supplies were shown to have been taken from the vaults of the court house, apparently by the breaking of a window of one of the vaults, and the entry into the vault by that method. Said ballots were never returned, and their whereabouts is not known.

It is shown in the evidence that early in the morning of November 16, W. A. Thornhill, Jr. went to the residence of C. E. Mahan in Fayetteville, in an adjoining county. Thornhill had been a candidate for the State Senate in the November, 1946, election, and on the face of the returns, had been defeated by some 531 votes. A recount of the votes cast in said election for said office had been demanded by Thornhill, and Mahan had been employed as his counsel therefor. Mahan testified that

Thornhill came to his home about 7 A.M. on the morning of November 16, and made two or more telephone calls; but it is not shown to whom the calls were made from any testimony of Mahan. One Eddie Stromp, an employee of the telephone company, attempted to trace some of these calls, but so far as we can observe the fact that the calls were made could have had no possible bearing upon the guilt or innocence of the defendant, James Edward Simon. There was also the testimony of Ray McCray, a janitor at the court house of Raleigh County, that subsequent to the election, and prior to November 16, 1946, Thornhill had discussed with him in a general way the result of the election, and made some inquiry as to whether or not the defendant, James Edward Simon, was trustworthy and could be relied upon. It was also shown by McCray that he assisted Thornhill in getting in contact with Simon on one or more occasions prior to November 16. All of this evidence was introduced over the objection of the defendant, on the general theory that inasmuch as the State was relying for conviction on the claim of a conspiracy between the defendants in the said indictment, to commit the offenses alleged therein, all of such conduct on the part of Thornhill, testified to by Mahan, and conversations had with McCray, were either before or after the purposes of the conspiracy had been formed, or it had been abandoned and were, therefore, inadmissable.

The defendant elected not to testify in his own behalf at the trial, as he had the right to do under the provisions of Code, 57-3-6. He offered no testimony in his defense, except that of a number of witnesses who testified as to his good reputation in the community in which he lived, prior to the date of the charge on which he was tried. In the course of the argument made by the prosecuting attorney, following the introduction of all of the testimony, he, on several occasions, referred to the fact that certain contentions of the State, allegedly sustained by evidence, had not been denied. He also made certain other statements during the course of said

argument to which exceptions were taken, and in some instances objections to such statements were overruled, and in other instances sustained, and the jury admonished not to consider them. The contention of the defendant is that under Code, 57-3-6, some of the statements so made by the prosecuting attorney amounted to a comment on his failure to testify, and this point is relied upon as one of the grounds for a new trial in this case. In this connection it might be well to say that by instruction number 17, given by the court at the instance of the defendant, the jury was instructed that the fact that the defendant did not testify as a witness in his own behalf could not be taken or considered as any evidence or circumstance of the guilt of the accused, and that no presumption should be formed against him because he did not testify in his defense.

As heretofore stated, the defendant's motion for a new trial was overruled on June 21, 1947, and he was sentenced to confinement in the penitentiary on that day. On June 26, 1947, the case against William Henry Lilly was being tried in the Circuit Court of Logan County, and prior to that date there had been a trial of the case against W. A. Thornhill, Jr., on the same indictment as that on which defendant herein was tried, which trials followed a change of venue, and resulted in separate verdicts of not guilty as to both Thornhill and Lilly. In the Lilly trial, the defendant, Simon, was required by the Judge of the Circuit Court of Logan County to testify, and he was permitted to be cross-examined by the prosecuting attorney of that county as to the statements he had made, and which were put in evidence against him in his trial in the Criminal Court of Raleigh County. It appears from an affidavit, dated July 22, 1947, about one month subsequent to defendant's sentence, and his testimony aforesaid in Logan County, that W. A. Thornhill, Jr. was tried on the said indictment in the Circuit Court of Logan County and was acquitted, and that in said trial there was testimony to the effect that at the time the alleged offense

was committed, W. A. Thornhill, Jr., Gordon Stevens and L. D. Collins were in the office of W. A. Thornhill, Jr. or not at the scene of the alleged crime, and not in the presence of this affiant. Also, that the said Lilly was likewise acquitted, and that from the testimony adduced in his case it developed that William Henry Lilly, Fred Snyder and Ernest Hardy were travelling in an automobile in the direction of the City of Hinton at the time of the alleged crime, and were not with this affiant. Apparently both Thornhill and Lilly were able to convince a jury of Logan County that they could not have been connected with the offense alleged against them in said indictment, and in that manner secured their acquittal of the charges against them. Defendant now maintains that these developments entitle him to a retrial of his case, on the general theory of after discovered evidence.

On July 23, 1947, defendant appeared in the criminal court of Raleigh County, tendered his plea in bar, the purport of which is that by reason of his being compelled to testify in the case of the State of West Virginia against William Henry Lilly, on June 26, 1947, he is, by virtue of Chapter 57, Article 5, Section 2 of the Code, entitled to complete legal immunity in respect to the sentence theretofore imposed on him by the Judge of the Criminal Court of Raleigh County. It will be observed that both the affidavit referred to above, and the plea in bar were each filed on July 23, 1947, more than one month after the final judgment of the Criminal Court of Raleigh County, but before the defendant's application for writ of error directed to the Judge of the Circuit Court of Raleigh County was passed on, said writ of error having been refused by said Circuit Court on September 3, 1947, and, of course, before the filing of the petition for a writ of error in this Court.

The defendant, in his petition for a writ of error to this Court, assigned twelve grounds of error. Among those assignments is one directing the Court's attention

to the fact that the defendant was found guilty as charged in the indictment, which contained three counts, whereas, the State elected to rely for conviction on the second count of the indictment and was tried on that count. We do not think there is any merit in this assignment, because it is provided in Code, 62-3-19, that:

"Where there are several counts in an indictment, and a general verdict of guilty is found, judgment shall be entered against the accused, if any count be good, though others be faulty. But on the trial, the court may, on motion of the accused, instruct the jury to disregard any count that is faulty."

In this case there was a general demurrer to the indictment, and to each count thereof, which was overruled, and we see no error in that ruling. The case was tried on the second count of the indictment because, on motion of defendant, the court required the State to elect on which count it would rely for conviction. In *State v. Johnson*, 111 W.Va. 653, 164 S.E. 31, it is held: "One good count in an indictment containing several counts relating to one and the same transaction will support a general conviction. The same rule applies whether there was a general demurrer to the indictment, or a demurrer to each separate count thereof." In *State v. Cooper*, 111 W.Va. 255, 161 S.E. 30, it was held: "A general demurrer to an indictment containing more than one count, one of which is good, should be overruled." and: "Upon a general verdict of guilty on such an indictment, the sentence should be entered on the good count." We see no reason why these rules should not apply to a case where the State is required to elect, among several counts, as to the one on which it relies for conviction. The other errors assigned, in the defendant's application for a writ of error, appear to be covered by the particular assignments of error set up in the defendant's brief filed herein.

The particular errors assigned in the defendant's brief and on which reversal is sought may be summarized as

follows: (1) The remarks of the prosecuting attorney in his opening statement to the jury, and in his argument of the case after the introduction of the testimony; (2) the introduction of evidence as to acts and conversations of W. A. Thornhill, Jr., claimed to be a conspirator with the defendant herein, and William Henry Lilly; (3) that the discovery of evidence after the trial and conviction, and sentencing of defendant, of which evidence the defendant had no knowledge at the time of his trial, entitle him to a new trial; and (4) that by reason of the fact that defendant was compelled to testify in the case of State of West Virginia against William Henry Lilly, as aforesaid, he is entitled to complete immunity from punishment for the offense of which he has been heretofore convicted, and sentence imposed. In our statement of errors, we have merged the two assignments as to the remarks of the prosecuting attorney, and the two assignments respecting the introduction of evidence.

Treating the assignments in this manner, we first take up that relating to the remarks of the prosecuting attorney. A part of his remarks made at the opening of the case, and before the introduction of testimony, are in the record, but we do not consider them because there appears to have been no objection to the said remarks at the time. A different situation exists in relation to the argument of the prosecuting attorney made after the introduction of the testimony, and those remarks are divided into two parts, the opening and concluding argument. Counsel for the defendant made certain objections to matters contained in said argument, among which was the statement of the prosecuting attorney to the effect that the people of Raleigh County were crying for help and protection, and a motion was made to declare a mistrial because of said statement and was overruled. The defendant then moved the court to instruct the jury to disregard such statements, which motion was sustained. A motion was then made to disregard the argument of the prosecuting attorney with

respect to comparison of handwriting and, so far as we can discover the court did not pass upon this motion. Objection was made to the statement by the prosecuting attorney to the effect that W. A. Thornhill, Jr. and William Henry Lilly should have testified, which objection was overruled. Objection to remarks of the prosecuting attorney in relation to the assertion that Mr. NeSmith was in Charleston was sustained, and the jury instructed not to consider it. At the end of the final argument of the prosecuting attorney, objection was made to the statement that: "It is through your help and this alone that the people can get the protection which they so sorely need", which objection was overruled, as was an objection to the statement that: "if you want the votes of the good people of Raleigh County permanently recorded and kept, it is up to this jury". A motion to disregard statements of the prosecuting attorney, to the effect that the situation which had developed was embarrassing to Senator Kilgore, was sustained. Statements made by the prosecuting attorney that Simon might run away, and statements that Thornhill furnished bond to pacify Simon, and his argument that the defense then being made was a defense of Thornhill, and a statement that if the defendant was not guilty, and Thornhill and Lilly knew it, and that they could have been called as witnesses, were all overruled; but a statement of the prosecuting attorney to the effect that the defense of Simon was paid for by Thornhill was sustained, and the jury instructed to disregard the same.

We have carefully considered these objections to the prosecuting attorney's argument above referred to, and we think, on a whole, the interest of the defendant was protected by the court, and that there was no error in its ruling. It is not every improper remark of a prosecuting attorney that is prejudicially erroneous. We can not put prosecuting attorneys in a straight jacket. They are human, and like most people will, in the heat of argument, make statements and arguments in which,

in cooler moments they would not indulge. We can not justify the reversal of cases merely because a prosecuting attorney will sometimes use language which the situation does not entirely justify. He is permitted to argue on inferences. The holdings of this Court which stress that a prosecuting attorney should be fair, are not, we think, meant to discourage zeal and vigor in the prosecution of persons charged with crime. *State v. Hively,* 103 W.Va. 237, 136 S.E. 862. And on this point the discretionary rulings of the trial court will not be interfered with unless it appears that the rights of the complaining party have been prejudiced, or that manifest injustice resulted therefrom. *State v. Boggs,* 103 W.Va. 641, 138 S.E. 321.

But there is one point in this assignment of error to which we think special attention should be given, and that is the claim that the argument of the prosecuting attorney in which he made the statement that the State had fully established its case, and that none of the testimony on which it relied had been denied. The defendant not having testified in the case, it is contended that this was a comment on the fact of defendant's failure to do so. Code, 57-3-6, provides that:

"In any trial or examination in or before any court or officer for a felony or misdemeanor, the accused shall, with his consent (but not otherwise), be a competent witness on such trial or examination; and if he so voluntarily becomes a witness he shall, as to all matters relevant to the issue, be deemed to have waived his privilege of not giving evidence against himself and shall be subject to cross-examination as any other witness; but his failure to testify shall create no presumption against him, nor be the subject of any comment before the court or jury by any one."

The principle involved in this statute was upheld in *State v. Taylor,* 57 W.Va. 228, 50 S.E. 247; *State v. Costa,* 101 W.Va. 466, 132 S.E. 869; and in *State v. Jones,* 108

W.Va. 264, 150 S.E. 728. But in *State v. Chisnell,* 36 W. Va. 659, 15 S.E.. 412, the Court held that where prosecuting attorney in his argument before the jury had alluded to the failure of the accused to testify, and upon objection thereto had asked that the jury be instructed not to consider remarks and the court had so instructed the jury, there was no ground for a new trial. Later in the case of *State v. Kincaid,* 104 W.Va. 396, 140 S.E. 338, point 3 of the syllabus reads as follows: "A case wherein a statement made by the prosecuting attorney in his argument before the jury to the effect 'that the State had proven that the defendant had had sexual intercourse and carnal knowledge of the prosecuting witness, at Page, Thurmond, Charleston and Huntington, and that said evidence had not been denied', but without allusion to defendant's failure to testify, does not come within the inhibition", referring to the then Section 19 of Chapter 152 of the Code which in substance is the same as our present statute. And in *State v. Nazel,* 109 W.Va. 617, 156 S.E. 45, it was held: "A statement of the prosecuting attorney in his argument to the jury that 'not a single witness has been introduced by the defendant here to controvert those facts', but without. specific allusion to defendant's failure to testify, does not come within the inhibition of section 19, chapter 152, Code." The provisions of Section 19 of Chapter 152 of the Code, above referred to, reads:

> "But nothing in this section shall be construed as being compulsory upon either husband or wife, and a failure to make such request by either party shall not create any presumption against him or her, nor shall any reference be made to nor comment upon such failure by any one during the progress of the trial in the hearing of the jury."

The entire section, of course, refers to the competency of the husband or wife to testify in behalf of the other, and their failure to be permitted to do so. As far as we can observe, the prosecuting attorney in his argument

before the jury never at any time made direct reference to the failure of defendant to testify, and under the rulings in the cases above cited and quoted, we can come to no other conclusion but that what the prosecuting attordid say can not be considered as amounting to the comment which the statute inhibits.

The case was tried on the theory that a conspiracy existed between the defendant, and W. A. Thornhill, Jr., and William Henry Lilly, to commit the offense alleged in the indictment. There is no direct charge of conspiracy in the indictment, but we think it is settled practice in this State that in cases, where there is an indictment charging two or more persons with the commission of an offense, evidence may be introduced to show common purpose, or in other words a conspiracy, to commit the offense alleged, in order that testimony of one of the parties to the offense may be introduced and considered in connection with the trial of any one of them, even though the acts or statements are not committed or made in the presence of defendant being tried. In this case, apparently, the State attempted to establish concert of action between the three defendants named in the indictment. Under our authorities it seems clear that testimony of acts or declarations of a coconspirator, to be admissible, must show that they were committed or made while the conspiracy was in existence, and that acts or statements made by a person either before such conspiracy exists, or after it has ended or has been abandoned, is not admissible. In *State v. Price,* 114 W.Va. 736, 174 S.E. 518, it was held by this Court that: "The declarations or admissions of a participant in a conspiracy, made after the conspiracy has terminated, are not admissible in evidence against a co-conspirator of the person making the declarations or admissions." But in the same case it is held that: "Declarations and admissions of an accomplice or coconspirator made during the continuance of the conspiracy and before its object is accomplished are ad-

misible in evidence as against all persons participating in the conspiracy even though they were not present when such declarations or admissions were made, provided that, before such declarations or admissions are admitted in evidence, the state has established the conspiracy by prima facie proof." In the case at bar, the State, by the introduction of the alleged confessions of the defendant, had made *prima facie* showing that there was concert of action, the equivalent of a conspiracy, between the defendant and W. A. Thornhill, Jr., and William Henry Lilly. On this theory certain evidence was introduced as to the acts and declarations of W. A. Thornhill, Jr. It is shown by the testimony of C. E. Mahan, who was counsel for Thornhill in connection with the contemplated recount, that early in the morning of November 16, 1946, Thornhill came to his home in Fayetteville and while there made two or more telephone calls. Nothing Thornhill did in the presence of Mahan in any way involved the defendant, nor could it be said that his acts were in any wise prejudicial to the defendant. As far as we can see, the evidence had no bearing on the case whatever. Likewise, evidence was introduced attempting to show the origin and destination of certain telephone calls made by Thornhill, and perhaps by others, but the defendant was in no wise involved in any of these messages. Most important item of evidence under this classification was conversations between W. A. Thornhill, Jr., and Ray McCray, a janitor at the court house of Raleigh County. McCray says that sometime after the election he had a conversation with Mr. Thornhill in which Thornhill told him that the election had cost him $8,000.00, and that he made the statement that he could spend more if Henry Lilly would do a few things for him; and that later, probably the same evening, Thornhill asked him: "Ray, what kind of a fellow is Ed-Simon" and on being asked what he meant he said: "Being honest and truthful" and that he told him "Ed Simon is a nice fellow, I would lend him my last dollar." He then said that still later he saw Simon, on the Thurs-

day night before the alleged offense was committed which, being interpreted, means the offense being committed on Friday night or early Saturday morning of November 16, 1946, the witness saw Simon on the Thursday before. He also made statements that Thornhill had made inquiries about the whereabouts of Simon and that he aided in arranging contact between Thornhill and Simon. The result of these conversations and contacts are shown by statements afterwards made by Simon.

One of the particular points raised here that these acts and conduct of Thornhill, if they occurred, were not made during the course of any conspiracy between the three defendants named in the indictment, but were either made before such conspiracy was in existence, or after it had ended or its purposes abandoned. We do not think the evidence shows this to be true. There is evidence in the record to the effect that this conspiracy originated in the mind of Thornhill as early as November 10, and it is fair to assume that he prosecuted it from that time on, and we think the evidence tends to so show. In the statement made by Simon on November 16, Simon states that: "On Sunday, November 10, 1946, Mr. Thornhill called me from his office by telephone, and asked me to come to his office in the Lawyers Building. I went over, and he and I talked privately in his private office. Mr. Thornhill wanted me to see that the window of the vault in the County Clerk's Office was left unlocked or in such fashion that I could get in and get certain ballot boxes for him. He told me that he would make it all right with me if I would do that. I refused at the time and finally left and went back to my room." He then states that he was again called on November 11, and from that time on until the night of the 15th and the morning of the 16th of November, the matter proceeded. Just when the conversation with McCray occurred, the record does not disclose, and we cannot say that it occurred before the conspiracy was in existence. We do not think it is required that there be shown that there

was a meeting of the minds of all of the conspirators upon the matter of the conspiracy. Certainly the steps leading up to the consumation of the conspiracy are proper to be considered; and on the other hand acts and conduct of persons immediately following the attempt to carry the conspiracy into effect, and so closely associated with it as to make it a part of the affair, may also be considered. In this category we think the visit of Thornhill to his attorney immediately after the alleged conduct at the President Hotel, and after he was seen around the court house, may properly be considered. Facts introduced in evidence as to Thornhill's candidacy for the State Senate, his purpose to have a recount of the ballots, the fact that Simon was his friend and supporter in the election, are merely background leading up to the event, and so far as we can see were in no sense of the word prejudicial to the defendant. Thornhill was within his rights in asking for a recount of ballots, and consulting with his attorney, in enlisting the support of Simon in his candidacy, and the introduction of these matters into evidence while not perhaps necessary were in no sense prejudicial. We are of the opinion that the trial court had the right, upon the *prima facie* showing made by the State of the existence of the conspiracy, to hold that the acts and statements of Thornhill, both before and after the breaking into of the court house, and of the tampering of the ballots at the President Hotel in Beckley, were acts and statements committed in the course of a conspiracy between the parties, and that the evidence of acts and conduct of Thornhill disclosed by the evidence was admissible. This is aside from the fact that, in our opinion, such evidence, even though inadmissible, was in no wise prejudicial. We are fully advised of the general rule that inadmissible testimony is presumed to be prejudicial, but this Court held in *State v. Rush*, 108 W.Va. 254, 150 S.E. 740, that: "A verdict of guilty in a criminal case will not be reversed here because of error committed by the trial court, unless that error is prejudicial to the accused." And in the

same case it is stated that: "The rule of 'harmless error' is settled law in this State." Citing *State v. Lane,* 44 W.Va. 730, 29 S.E. 1020; *State v. Miller,* 85 W.Va. 326, 102 S.E. 303; *State v. Smith,* 97 W.Va. 313, 125 S.E. 90; *State v. Dephenbaugh,* 106 W.Va. 289, 145 S.E. 634.

As has been stated, the defendant was on June 21, 1947, sentenced by the Criminal Court of Raleigh County to confinement in the penitentiary for not less than one nor more than ten years. Subsequent to this sentence, the defendant was required by the Circuit Court of Logan County to testify in the case of the State of West Virginia against William Henry Lilly, which was being tried on the same indictment, and that testimony was given on June 26, 1947, and the prosecuting attorney of Logan County was permitted to cross-examine the defendant at length as to his participation in the offense on which Lilly was then being tried, and particularly as to the several statements made by the defendant to which reference has been made. On July 23, 1947, an order was entered in the Criminal Court of Raleigh County from which it appears that on June 28, 1947, the defendant moved the court to suspend the sentence theretofore imposed upon him; and further moved the court to place the defendant on probation; and that on July 12, 1947, the defendant offered additional argument in support of his motion for probation and renewed his motion for bond, which motion the court took under advisement, and on July 19, 1947, counsel for the defendant was advised that the said motions were overruled, although apparently no record was made thereof. The order then shows that on July 23, 1947, the defendant again appeared, tendered his plea in bar, setting forth the fact that the defendant, notwithstanding his objections, was compelled to and did testify in the Circuit Court of Logan County on the 26th of June, 1947, in the case of State of West Virginia against Lilly, being tried upon indictment number 2048 returned by the grand jury of Raleigh County against said defendant,

and William Henry Lilly and W. A. Thornhill, Jr., and being the same indictment under which he had been convicted and sentenced, said affidavit of the defendant seting forth the grounds upon which he believed he was entitled to a new trial. The plea in bar was filed and the State demurred thereto, which demurrer the court sustained, and the affidavit appears to have been filed. The court then found that the affidavit was not sufficient in law to entitle defendant to a new trial, and his motion therefor was overruled. Likewise overruled was the motion that the defendant be placed on probation and that the sentence theretofore imposed upon him be suspended and he was denied bail; to each of which rulings the defendant excepted at the time and bills of exceptions covering the whole case were signed.

The motion for a new trial, subsequent to the final judgment of the court sentencing the defendant to confinement in the penitentiary, presents a situation which, it seems to us, is rather novel in the judicial history in this State. There must, of course, be finality to all litigations, and we have not understood that after the final judgment of a trial court in a criminal case, the case may again be reopened and retried, except through appellate action, and certainly not by reason of developments arising subsequent to the entry of the final judgment. We think, therefore, the trial court properly overruled defendant's motion for a new trial. Furthermore, we do not think that even if the court had power to properly consider the motions, the affidavit filed furnishes sufficient grounds for a new trial on the theory of after discovered evidence. The general rule which applies to granting of a new trial on after discovered evidence has been plainly stated in many decisions of this Court, and was restated in the case of *State v. Ludwig*, 102 W.Va. 363, 135 S.E. 277. There is nothing in this record to show that Thornhill and Lilly were not available as witnesses in behalf of the defendant. The fact that both or either of these men could have refused to testify,

on the grounds that their testimony might tend to criminate them, did not prevent the defendant from summoning them as witnesses, in an effort to establish through them the facts which he now seeks to establish. The privilege of refusing to testify was one which either Thornhill or Lilly might have chosen to waive. Aside from the fact that after final judgment was entered, the trial court has no further power to grant a new trial, the showing made by the defendant was not sufficient to entitle him to such trial had it been made at a time when the trial court could have properly acted on the motion therefor. In our opinion, the court committed no error in refusing a new trial. Of course, the matter of suspending sentence or placing the defendant on probation was within the discretion of the trial court.

The so-called plea in bar raises the point that testimony which the defendant was compelled to give in the trial of William Henry Lilly in the Circuit Court of Logan County, now calls for his release from all responsibility in connection with the offense about which he testified at the command of the court. We do not believe Code, 57-5-2 should be construed to grant to the defendant immunity from punishment for an offense of which he had already been convicted and sentence imposed. That section provides:

"In any criminal proceeding no person shall be excused from testifying or from producing documentary or other evidence upon the ground that such testimony or evidence may criminate or tend to criminate him, if the court in which he is examined is of the opinion that the ends of justice may be promoted by compelling such testimony or evidence. And if, but for this section, the person would have been excused from so testifying or from producing such evidence, then if the person is so compelled to testify or produce other evidence and if such testimony or evidence is self-criminating, such self-criminating testimony or evidence shall not be used or receivable in evidence against him in any pro-

> ceeding against him thereafter taking place other than a prosecution for perjury in the giving of such evidence, and the person so compelled to testify or furnish evidence shall not be prosecuted for the offense in regard to which he is so compelled to testify or furnish evidence, and he shall have complete legal immunity in regard thereto."

It will be noted that this section provides that in proceedings against the witness thereafter taken, the witness shall not be prosecuted for an offense in regard to which he had been compelled to testify. By no stretch of the imagination can this be made to cover the cases where there had been a prosecution, a conviction and a final entry of judgment on such conviction. True, at the time defendant was so required to testify there had not been a final adjudication of his case, in the sense that all rights to appeal to appellate courts had been foreclosed. As a matter of fact, the judgment against defendant was sought to be set aside by application for a writ of error to the Circuit Court of Raleigh County, and on refusal of that writ, this Court granted the present writ of error. But, until reversed by the Circuit Court of Raleigh County or by this Court, the judgment of the Criminal Court of Raleigh County was final. No one will say that had the defendant been confined in the penitentiary at the time of the Lilly trial in Logan County, he could not, by leave of court, have been brought from the penitentiary and required to testify. That is expressly provided by Code, 57-3-5, and in such a case no one would contend that being required to testify would operate to release him from the punishment which had been theretofore imposed upon him. What the statute intended to mean was where a court, at the instance of the State, or otherwise in the public interest, requires a person to testify as to matters which might incriminate him, he can not thereafter be prosecuted for the offense about which he testifies because such a procedure would, in a sense, be compelling him to aid in his conviction by his own testimony.

We have given mature consideration to this case. Undoubtedly a serious crime was committed in Raleigh county on the night of November 16, 1946. Ballots, representing the sentiments of the people of that county, were carried away and apparently destroyed. The defendant here on trial, confessed, on three separate occasions, to his participation in that crime. There is nothing in the record to indicate that his statements were not made voluntarily in the full sense of that term. The fact that they were made to officers of the law, and while the defendant was in custody, do not make them inadmissible. "The fact that a confession has been made to a public officer, as a sheriff or public prosecutor, will not render it inadmissible, provided it has been freely and voluntarily made, though in response to questions, if made without any threats or intimidations or promises of reward or immunity from punishment for the crime." *State v. Richards,* 101 W.Va. 136, 132 S.E. 375. Defendant, after making such statements, elected not to deny the same, when he was tried, and which he had the right and privilege of doing, such election not being allowed to prejudice his position before the jury, other than the deduction which a jury would necessarily draw, and against which no court can assure a defendant who pursues that course. The confessions of the defendant were corroborated by facts and circumstances, likewise undenied by any person. The fact that the other parties to the indictment were later acquitted can not be treated as having any bearing whatever on the case at bar. Defendant was, in our opinion, given a fair trial and was found guilty. What might be called the zeal·of the prosecuting attorney and his conduct of the prosecution did not, we think, reach the point which would justify us in setting aside the verdict of the jury on that ground. On the whole, the evidence fully sustains the jury's verdict, and the judgment entered thereon must be affirmed.

*Affirmed.*

RILEY, JUDGE, dissenting:

I respectfully dissent from the result reached in the majority opinion in this case on the sole ground that after the conspiracy had been consummated and its common purpose effectuated, the court permitted C. E. Mahan, an attorney at law practicing in Fayette County, to testify that about seven o'clock on the morning of Saturday, November 16, 1946, W. A. Thornhill, Jr., came to his house with the evident purpose of placing a telephone call to Charleston, and that prior thereto witness received a telephone call purportedly from Thornhill, in which the latter informed witness that "There was some suspicious circumstances going on around the Court House at Beckley." This testimony was given in answer to the inquiry: "Were you informed by Mr. Thornhill that there had been any irregularity in the handling or the safekeeping of the ballots?" All of Mahan's testimony as to the telephone conversation is, in my opinion, inadmissible and requires reversal of this case.

It is the prevailing rule in this jurisdiction that "After the conspiracy has been consummated, and the common purpose carried fully into effect, subsequent acts and declarations of any of the co-conspirators, made in the absence of the others, are not admissible in evidence against the latter." 2 Lee, The Criminal Trial in the Virginias, 2d Ed., p. 562, Section 814, and cases cited; *State v. Campbell*, 115 W.Va. 198, 174 S.E. 797; *State v. Spurr*, 100 W.Va. 121, 130 S.E. 81; *State v. McCoy*, 61 W.Va. 258, 57 S.E. 294. Of course, when the making of a statement by a conspirator after the conspiracy is accomplished is so closely connected with the major purpose of the parties as to form a part of the *res gestae*, it is admissible; but when the statement is not a part of the *res gestae* it is clearly inadmissible. *State v. Hively*, 103 W.Va. 237, 136 S.E. 862; *Willis v. Blue Ridge Bank*, 153 Va. 392, 149 S.E. 624; 2 Lee, The Criminal Trial in the Virginias, 2d Ed., p. 563, Section 815.

352

I do not think that the telephone conversation was so closely connected with the consummation of the alleged crime as to make it a part of the *res gestae*.

It follows that I would reverse the judgment of conviction.