In re Molly Jane COLEMAN, Debtor.

Molly Jane Coleman, Plaintiff,

v.

Community Trust Bank,
et al., Defendants.

Bankruptcy No. 7–01–01199–WSB–11.
Adversary No. 7–01–00047.

United States Bankruptcy Court,
W.D. Virginia,
Roanoke Division.

Sept. 17, 2002.

John M. Lamie, Esq., Browning, Lamie & Gifford, Abingdon, VA, for Debtor.

Mark L. Esposito, Esq., Penn, Stuart & Eskridge, Bristol, VA, for Community Trust Bank.

Charles H. Keen, Esq., U.S. Department of Justice, Washington, DC, for Internal Revenue Service.

## MEMORANDUM OPINION

WILLIAM F. STONE, Jr., Bankruptcy Judge.

In this adversary proceeding the Debtor, acting in her capacity as Debtor–in–Possession, seeks to avoid two deeds of trust which she and her husband, Roger Coleman, granted to the Defendant, Community Trust Bank ("the Bank"), to secure certain obligations of the husband and his business partner, Darrell Cook, on the ground that they were given to hinder and delay the collection efforts of the Internal Revenue Service. The Debtor has testified unequivocally that the only reason she signed the deeds of trust was to keep the properties they encumbered out of the hands of the IRS and claims that she was told by her husband that the attorney then representing the coal companies owned by Mr. Coleman and Mr. Cook in Chapter 11 bankruptcy cases had advised that such deeds of trust would be in fraud of creditors and could later be avoided. Determining whether these deeds of trust can be set aside in Mrs. Coleman's personal Chapter 11 case depends on the answer to a question made famous by Senator Howard Baker in a much more momentous context, "What did he [in this case, the Bank's loan officer] know and when did he know it?"

## UNDISPUTED FACTS

Roger Coleman and Darrell Cook were the equal owners of a number of coal companies which apparently for some years had been quite successful and provided a very comfortable standard of living for Roger and Molly Jane Coleman. Unfortunately, this success proved to be fleeting and by 1994 several of these companies were in trouble and in November of that year filed Chapter 11 bankruptcy petitions in this Court. Furthermore, the Colemans as well as Mr. and Mrs. Cook were financially embarrassed because one of their other companies, namely, Faith Coal, had earned a large profit in 1993 which had been used to subsidize losses incurred in two of the other companies rather than being distributed to its owners. Because this company was subject to a "Subchapter S" tax election, which meant that its profits were taxed directly to its shareholders rather than being subject to tax at the corporate level, the Colemans and the Cooks faced large personal tax liabilities for income which they had not actually received. As a result they were not in a financial position to pay the resulting tax liabilities. During the time period which is critical to the issues in contention in this adversary proceeding, Mr. Coleman and Mr. Cook had two principal concerns, (i) their need to seek accommodations from the Bank, which was the principal secured lender to their companies in bankruptcy and to which they were liable not only on the loans to or incurred jointly for the companies but also upon certain unsecured loans to each of them individually, and (ii) their large personal tax liabilities to the IRS which affected not only them but also their respective spouses as well. Mr. and Mrs. Coleman owned jointly and apparently as tenants by the entireties two valuable parcels of real estate, one being their residence property located in Buchanan County, Virginia, and the other being located on Holston Lake in Sullivan County, Tennes-

see. Both properties were unencumbered and were at risk of IRS tax liens being filed against them. Other than an automobile owned by Mrs. Coleman, these properties constituted the only assets of substantial value in which she had an interest.

Although the financial skies were darkening for the Colemans and the Cooks as 1994 neared its end, they were not at all without hope that better times were around the corner. For one thing, Mr. Coleman and Mr. Cook believed that they could move coal mining equipment which served as collateral for the Bank's loans to other mines and soon return to profitability. To be able to do that they needed, or at the very least wanted, to get the Bank's consent to such proposal. For another thing, their companies' bankruptcy counsel had assisted them in securing new professional accounting and legal help with a view to filing consolidated tax returns for their companies so that losses could offset profits and amended returns could be filed which would relieve them of their personal tax liabilities. In short, both corporately and personally, they needed time to deal with their business and tax problems because they were not then in a position to meet either their companies' or their personal debt service obligations to the Bank or to pay the amounts currently owed to the IRS. A contemporaneous record provides insight into the situation which they faced. A "Call Report" was prepared by Steve Belcher, the Bank's loan officer for the Coleman and Cook accounts, on November 17, 1994 concerning news which he had received that date from Mr. Cook and Mr. Coleman concerning the Chapter 11 bankruptcy filings of Big Fist Coal Company and its subsidiaries "as a result of adverse business conditions and certain IRS tax liens." At that time Big Fist owed $263,704 to the Bank with a monthly payment obligation of $12,155. This loan was secured by equipment which had been appraised as being worth $614,500. A second loan to Coleman and Cook was in the amount of $707,890 and was secured by equipment which had been valued as being worth $1,615,400 in April of the preceding year and by the guaranty of Big Fist and Magic Mining, one of the former company's subsidiaries. In addition to these joint obligations Mr. Coleman had an unsecured loan from the Bank in the amount of $84,626 then owing and Mr. Cook had a similar unsecured loan having a then balance of $85,678. At that time the personal statements of Coleman and Cook on file with the Bank showed "cash assets and a strong net worth." According to the Call Report, Coleman and Cook reported that all of their existing mines were profitable and that they intended "that these accounts are to be maintained current." The Report stated that Coleman and Cook wanted to sell the equipment owned by Big Fist and pay the Bank and "that their primary goal and concern is seeing that the bank is paid in full." The situation had changed somewhat, however, by December 7, 1994 when Mr. Belcher met at the Big Stone Gap Courthouse with Mr. Coleman, Mr. Cook, the companies' bankruptcy counsel, Mr. Copeland, and the Bank's attorney, Mr. Esposito. The parties did discuss again the sale of certain equipment, the proceeds of which would come to the Bank, but they also discussed Coleman's and Cook's wish to move certain equipment from "the Appalachia Big Fist mines" to certain other mines. According to the representations made at that meeting and recorded in a memo prepared by Mr. Belcher (which was dated December 9 rather than the actual date of the meeting), the planned asset sales would reduce the balance on the large Coleman and Cook loan from $707,890 to approximately $400,000, which Mr. Copeland "stated that his clients would like to repay ... [in]

monthly payments beginning February, 1995." Mr. Copeland "also requested that the Bank consider reamortizing the new balance over the remaining term of the note so as to reduce the payment structure." During this meeting the participants also discussed the IRS problems. Because of its importance to the issues raised in this adversary proceeding, the relevant passage of the memo will be quoted in full:

> Mr. Copeland expressed that the main reason for the filing of the Chapter 11 Bankruptcy by Big Fist Coal was to eliminate the pressure that the IRS was placing on his clients. Through the reorganization, as long as post taxes are paid, the companies will be free to operate. Prior taxes that are due, hopefully, can be worked out and eliminated through the net operating loss carry forward from the previous companies. Mr. Copeland states that the IRS problem arose when one of the companies known as Faith Coal which was an S-corporation had profits in excess of $1,000,000.00. The profits from Faith Coal was expended to Big Fist and Raider to help start up and maintain their operations. When the IRS audited Faith and related companies, they said that this money was direct income to Coleman and Cook which resulted in both Coleman and Cook having tax liabilities in excess of $375,000 for the year. Mr. Copeland was confident that the filing of the Chapter 11 would allow the CPA firm (Management Accountant Solutions of Roanoke, VA) recently hired by Coleman and Cook to consolidate all of the companies under the heading of Big Fist Coal. Upon this consolidation, they would be able to uti-

lize the net operating loss of Big Fist and Raider to offset prior taxes due.

The meeting also covered Coleman's and Cook's unsecured obligations to the Bank and they "expressed their willingness to maintain their personal obligations in a timely manner." At that point Mr. Esposito, Bank's counsel, "requested possible collateralization of the unsecured loans" as to which "all parties were agreeable". They specifically discussed a pledge of stock of Empire Coal, which was another company owned by Coleman and Cook and which was represented to have "in excess of $1.1 million in receivables from Big Fist, Raider and related companies." The memo does not record any conversation concerning any possible deeds of trust against the real estate owned by the Colemans and the Cooks. It did recite in detail the specifics of what equipment would be moved to which new locations and concluded with the mention that a motion would be made on December 14[1] to move the equipment from the Virginia mines to the Pike County, Kentucky locations and that upon the sale of that equipment, which was expected to be sold in the next week or so, "the money would be applied directly to the loan of Darrell Cook and Roger Coleman and the Big Fist loan". Mr. Copeland requested "that three payments be paid from the proceeds and the remaining be applied to principal."

On January 18, 1995 the Colemans signed and acknowledged the two deeds of trust now in issue. Both were under seal and were prepared by the Bank's law firm. The Virginia deed of trust was recorded on January 31, 1995. The recordation information as to the Tennessee deed of trust is not disclosed by the evidence. Prior to but around the same time that the Colemans signed their deeds of trust, Mr. and

---

1. This appears to be incorrect as such motion was actually heard in Big Stone Gap on December 7, 1994, the same day as the meeting referenced in the memo.

Mrs. Cook also granted two deeds of trust upon properties they owned in Virginia and Tennessee to secure Mr. Cook's obligations to the Bank. The IRS filed a notice of tax lien in Buchanan County against the Colemans' property in that jurisdiction on February 13, 1995. At all relevant times, Mr. and Mrs. Coleman have been and continue to be residents of Buchanan County, Virginia.

A hearing was held in this Bankruptcy Court on December 7, 1994 upon the motion filed by the corporate debtors owned by Mr. Coleman and Mr. Cook to obtain permission to move the mining equipment subject to the Bank's security interest. The Bank's counsel appeared at the hearing and expressed concerns about the Bank's security interest being protected in the equipment and that such equipment be insured against loss but indicated that the Bank was not opposed to the motion. Nothing was said about the Bank getting additional collateral as a condition of its consent. Subsequent to this hearing this Court entered an order on January 23, 1995 nunc pro tunc to December 2, 1994 which provided in part:

> 7. The authorization by the court is also granted, subject to the parties entering into agreements, which would provide adequate protection for the collateral of each estate, such as insurance, payment of funds or other means necessary and the parties are ORDERED to meet and confer to determine what documentation is necessary to protect the interest of the parties in the equipment so that no party is prejudiced by this order.

The deeds of trust from the Colemans and the Cooks appear to be the only collateral obtained by the Bank for the individual notes of Mr. Coleman and Mr. Cook personally. The evidence does not indicate that there was any further discussion of the possible pledge of stock in Empire Coal which had been mentioned in Mr. Belcher's memo dated December 9, 1994. The Bank has filed as exhibits in this proceeding copies of the two proofs of claim it filed in the Roger Coleman bankruptcy case. These proofs of claim contain copies of the notes and security agreements covering the two large obligations which were already secured by coal mining equipment at the time the January 18, 1995 deeds of trust were granted. No proof of claim was filed for the previously unsecured note of Mr. Coleman and no testimony was offered at trial to indicate that any amount remains due upon such obligation.

Mrs. Coleman's bankruptcy petition asserts that the combined value of the Virginia and Tennessee properties owned as tenants by the entirety with Mr. Coleman was $745,000 on the date she signed her schedules, March 19, 2001. The amount of the Bank's claims, which were indicated to be disputed, against these properties was indicated to be $900,000. The amount of the IRS claim was indicated to be $260,000 and this was also listed as disputed. The IRS has filed a proof of claim in the amount of $571,569.63 and at this point no objection to the allowance of such claim has been filed. The only other proofs of claim which have been filed to date are five claims on behalf of Galen Med, Inc., t/a Clinch Valley Medical Center in the aggregate amount of $22,559.34. The only other creditor listed in the petition is Bank of America on a credit card debt of $7,877.10. Although it did not file a proof of claim prior to the bar date of December 11, 2001, Schedule F of the petition did not indicate this debt to be disputed, unliquidated or contingent.

The basis for the assertion that the IRS's claim is disputed is that Mrs. Coleman has sought and continued to seek

relief from the 1993 joint tax liability on the ground that she is an "innocent spouse" entitled to take advantage of the provisions of 26 U.S.C. § 6015(f) adopted by Congress in 1998. Relief has been denied upon her application but special tax counsel has filed an appeal from this denial. No evidence was offered concerning the current status of this appeal but IRS counsel appeared and participated at trial in support of the Debtor–in–Possession's efforts to avoid the 1995 deeds of trust to the Bank.

## DISPUTED FACTUAL CONTENTIONS

The Debtor contends that Steve Belcher, the Bank's loan officer, knew that the Colemans were granting the deeds of trust to give them time to work out their problems with the Internal Revenue Service. Paragraph # 10 of the Complaint alleges that the Bank "knew or should have known that the conveyance of said property to the bank was done with the actual intent to delay, hinder or defraud the Internal Revenue Service from collecting the joint tax liability due and owing from Roger and Janie Coleman, and any other creditors." Mr. Coleman testified that Mr. Belcher made a comment upon picking up the deeds of trust that now they wouldn't have to worry about the IRS. On the other hand, Mr. Belcher claimed in his testimony that he had no knowledge at the time that there was any tax claim against Mrs. Coleman at all and that he did not become aware of this until long after the fact when Mr. Coleman in his bankruptcy case tried to set aside the deeds of trust. Mrs. Coleman claims that she received no consideration of any kind from the Bank in exchange for conveying her interest in the Virginia and Tennessee properties. For its part, the Bank asserts that the Coleman household income was dependent upon Mr. Coleman's business activities and the Bank's willingness to work with Mr. Coleman and Mr. Cook and their businesses in their companies' bankruptcy cases rather than taking a hard adversarial stance regarding the loans, such as demanding substantial adequate protection payments as a condition of not seeking relief from the stay, furnished ample consideration to both of the Colemans supporting the deeds of trust.

As evidence of the knowledge on the part of the Bank's loan officer, Mr. Belcher, of the Colemans' intent to hinder or delay the IRS's collection efforts, the Plaintiff has offered the following excerpt from Belcher's deposition testimony:

Q. Do you recall what led to Mr. and Mrs. Coleman giving the deed of trust to the Bank?

A. Yes.

Q. What was that?

A. There were several specific reasons.

Q. Could you expand on what those were?

A. During this time they were having financial problems, and they were in the process of desiring to move their equipment or relocate their equipment in different minesites or a minesite. And they requested the Bank for permission to move the equipment and to relocate its equipment. And mining equipment, especially when in use, has a high rate of deterioration or depreciation. And additional collateral was offered.

Q. You say "additional collateral was offered". It was offered by whom?

A. By Coleman and Cook.

Q. And did you request the additional collateral before they could move the equipment, or did they just offer to give you the collateral on the loan?

A. The equipment ... or the collateral was offered by Coleman and Cook.

Q. Right. Did they just offer that as extra security on the loan?

A. For permission to relocate the equipment, and then additional comments and requests were made. The I.R.S. was involved. And they were negotiating with the I.R.S. They had obtained tax counsel. They were refiling their taxes on the different companies. And they requested ... were asking for time between the I.R.S... to file it. And so additional collateral was offered or as collateral to obtain the time to file the amended tax returns.

Q. So they were giving you additional collateral, so they could file ... so they could have extra time to file tax returns?

A. Yes.

Q. And the Bank ... why were they giving collateral to the Bank and asking for time?

A. Their property was unencumbered, and the I.R.S. would come in and levy on the property.

. . . .

Q. Was that all done at the same time? In other words, did they come to you and say, "We need some extra time to file our taxes. We want to give you this land as collateral on the loan, and we want to move the equipment."? Or did they just come and tell you they wanted to give you an interest in the land, and then later came to you at a different time and said, "We need to move this equipment. Can you just use that land that we gave you earlier as extra collateral."?

A. They had multiple reasons, and they were given at basically the same time.

(Belcher deposition testimony, line 20, page 28, thru line 4, page 30, and line 19, page 30, thru line 2, page 31).

At trial Mr. Belcher claimed that this deposition testimony included knowledge that he later obtained from the allegations contained in the adversary proceeding filed by Mr. Coleman against the Bank and that he was unaware at the time of any intent on the Colemans' part to put their property out of the IRS's grasp. In its essentials, however, this testimony is consistent with that given by Mr. Copeland at trial concerning the discussions he had with Mr. Coleman and Mr. Cook about the granting of the deeds of trust to the Bank:

Q. What was the specific problem faced by Roger and Darrell in regard to their tax situation in October or November of 1994?

A. They had paid ... they had turned over, or the I.R.S. had seized (I am not sure which) ——. I believe that they voluntarily turned over all of their cash they all had on hand. And the I.R.S. was very aggressively going after Mr. Cook and his spouse and Mr. Coleman and his spouse for the income tax liability as a result of the failure to declare .... Mr. Coleman's and Mr. Cook's failure to declare the income.

Q. And did you meet with Mr. Cook and Mr. Coleman to discuss those issues?

A. I had met with them to discuss the Big Fist issues and the issue came up.

Q. And did they ask of you any ... about that matter, as far as the legal rights and that kind of thing was concerned?

A. Mr. Cook had previously, and then Mr. Coleman asked in the meeting what Mr. Cook and I had discussed by telephone.

Q. And what did you tell Mr. Coleman?

A. Well, I told Mr. Coleman basically that he was between a rock and a hard spot, that I thought that Big Fist could get a better break from Pikeville National Bank if it had ... if they would give Pikeville National Bank a deed of trust on their properties, the idea being that if banks have more secure collateral (not mining equipment), they could give better terms and better ... you know, better terms to the company because they wouldn't be worried about depreciation and the equipment getting lost and damaged. And I also told Mr. Coleman about Section 548 of the Bankruptcy Code. I explained to him how that if they did transfer the assets and things didn't work out, that if they filed Bankruptcy within one year personally, they could file a complaint to recover the deed of trust.

Q. And that would be under what basis?

A. Fraudulent transfer.

(Copeland trial testimony, line 4, page 33 thru line 16, page 34).

Q. And as I understand it, you suggested to him that he pledge this real estate to the Bank to get more favorable terms, to induce the Bank to work with them in terms of restructuring the debt and making deferments and that kind of thing?

A. Yes, sir. It was the decision of who your friend was. You know, where ... what is to the best interest of Big Fist. Where is Big Fist going to benefit? If you are going to lose your real estate, then you would obviously ... it is better to have it in the hands of your lending ... your senior lending bank that will then give you longer and better terms to refinance your ... your debt.

Q. And I think you stated that the way to get that from a bank, the way to induce a bank to do that, is to give them collateral?

A. Yes, sir.

(Copeland trial testimony, lines 10–25, page 46)

## LEGAL CONTENTIONS

Mrs. Coleman asserts that the deeds of trust are void pursuant to Va.Code § 55–80 and Tennessee Code § 66–3–101.[2] The former statute reads as follows:

Every gift, conveyance, assignment or transfer of, or charge upon, any estate, real or personal, every suit commenced or decree, judgment or execution suffered or obtained and every bond or other writing given with intent to delay, hinder or defraud creditors, purchasers or other persons of or from what they are or may be lawfully entitled to shall, as to such creditors, purchasers or other persons, their representatives or assigns, be void. This section shall not affect the title of a purchaser for valuable consideration, unless it appear that

**2.** Tennessee has two fraudulent conveyance statutes dealing with transfers made with alleged intent to hinder, delay or defraud creditors. The one relied upon by the Plaintiff is the older of the two and is derived from British statutes that were adopted in North Carolina and continued in Tennessee when it became a separate state. The other is part of the Uniform Fraudulent Conveyance Act adopted by Tennessee in 1919. The latter is currently designated as Tennessee Code section 66–3–308 and reads: "Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud, either present or future creditors, is fraudulent as to both present and future creditors." *See In re Turner,* 78 B.R. 166, 169 (Bankr. E.D.Tenn.1987); *M. & N. Freight Lines, Inc. v. Kimbel Lines, Inc.,* 180 Tenn. 1, 170 S.W.2d 186, 187 (1943).

he had notice of the fraudulent intent of his immediate granter or of the fraud rendering void the title of such grantor. Tennessee Code § 66–3–101 reads as follows:

Every gift, grant, conveyance of lands, tenements, hereditaments, goods, or chattels, or of any rent, common or profit out of the same, by writing or otherwise, and every bond, suit, judgment, or execution, had or made and contrived, or malice, fraud, covin, collusion, or guile, to the intent or purpose to delay, hinder, or defraud creditors of their just and lawful actions, suits, debts, accounts, damages, penalties, forfeitures, or to defraud or to deceive those who shall purchase the same lands, tenements, or hereditaments, or any rent, profit, or commodity out of them, shall be deemed and taken, only as against the persons, such person's heirs, successors, executors, administrators, assigns, whose debts, suits, demands, estates, or interest, by such guileful and covinous practices as aforementioned, shall or might be in any wise disturbed, hindered, delayed, or defrauded, to be clearly and utterly void; any pretense, color, feigned consideration, expressing of use, of any other matter or thing, to the contrary notwithstanding.

In addition to denying that the deeds of trust were granted with the intention of hindering, delaying or defrauding creditors or that the Bank had any notice or knowledge of any such intent, the Bank has urged that the bankruptcy case itself and this adversary proceeding have been filed with an improper purpose and in bad faith, namely, to allow the Debtor to assume the powers of a bankruptcy trustee to challenge for her own benefit a transaction after she and her husband have received the benefit from it and which outside of bankruptcy she would have no standing to challenge. In short, she seeks to benefit from claims of her own fraudulent (in law) conduct. The Court has previously denied the Bank's motion to dismiss the bankruptcy case in a separate opinion, to which the Bank has filed a timely motion for reconsideration.

### CHOICE OF LAW

The parties are agreed that the applicable law governing deeds and encumbrances of real estate allegedly granted in fraud of creditors is the law of the jurisdiction where the real estate is located and this certainly appears to be the generally accepted rule. 37 Am.Jur.2d 792, Fraudulent Conveyances § 110 (1968); *Roberson v. Queen,* 87 Tenn. 445, 11 S.W. 38 (1889); Annot. Conflict of Laws as Regards Validity of Fraudulent and Preferential Transfers and Assignments, 111 A.L.R. 787 at 811 (1937); *Irving Trust Co. v. Maryland Casualty Co.,* 83 F.2d 168 (2nd Cir.1936) (L.Hand, J.); Restatement of the Law, Second, Conflict of Laws, § 223, comment f (1971). Accordingly, the validity of the Tennessee deed of trust is governed by the law of that state and the validity of the Virginia deed of trust is governed by the law of the Commonwealth. Similarly, the parties seem to be agreed that the evidentiary burden of proof to be met before a deed of trust can be set aside on state fraudulent conveyance law grounds is determined by the law of the respective state where the land is located, although they disagree on what that law is, at least in Tennessee. Although evidentiary matters are frequently determined to be procedural rather than substantive in nature and therefore controlled by the law of the forum court, where "the primary purpose of the relevant rule of the state of the otherwise applicable law is to affect decision of the issue rather than to regulate the conduct of the trial", the law of the otherwise

applicable law will be applied. Restatement of the Law, Second, Conflict of Laws, § 134 (1971). Accordingly, this Court will apply the burden of proof rule applicable to the jurisdiction in which a particular property is located. Tennessee law requires proof of an intent to hinder, delay or defraud creditors by a preponderance of the evidence, *United States v. Kerr*, 470 F.Supp. 278, 281 (E.D.Tenn.1978); *In re Hicks*, 176 B.R. 466, 470 (Bankr. W.D.Tenn.1995); *James v. Joseph*, 156 Tenn. 417, 424–26, 1 S.W.2d 1017 (1928), while Virginia requires that such proof meet the higher "clear and convincing" standard *Armstrong v. United States*, 7 F.Supp.2d 758, 764 (W.D.Va.1998); *In re Decker*, 295 F.Supp. 501, 507–08 (W.D.Va. 1969); *Hutcheson v. Savings Bank*, 129 Va. 281, 105 S.E. 677, 680 (1921). *In re Yost*, 47 B.R. 697, 699 (Bankr.W.D.Va. 1985) citing *Colonial Investment Co. v. Cherrydale*, 194 Va. 454, 73 S.E.2d 419 (1952).

## APPLICABLE VIRGINIA LAW

As early as 1826 the Supreme Court of Virginia (then the Supreme Court of Appeals of Virginia) dealt with the situation of a creditor participating in a transaction intended by his debtor to hinder, delay or defraud his other creditors·but where the creditor was only striving to protect his own interest in attempting to recover from the debtor. The reporter's headnote to the Court's opinion in the case of *Garland v. Rives*, 25 Va. 282, 4 Rand. (25 Va.) 282, 15 Am. Dec. 756, 1826 WL 1069 (1826) reads in part as follows:

> So ... if the grantee be privy to a fraudulent intent on the part of the grantor, and takes a deed to secure his own debt, with provisions to delay, hinder, or defraud other creditors, the deed will be void, although his only motive was, to secure his own debt, and the other provisions were forced on him by

the grantor, as the only means of having his own debt secured. Such a grantee will not be considered as a bona fide purchaser.

The opinion itself similarly states as follows:

> Without the bona fides on the part of the grantee, the valuable consideration has no effect in rescuing the transaction from the literal terms and spirit of the Statute. If Wingfield and Coleman could be considered as bona fide creditors for $13,000, and had aimed only at securing or getting payment of the debt, they would have been protected by the proviso of the Statute, no matter what had been the fraudulent intent of the grantor. But, at the moment they passed this line, and mixed with this object, that of delaying, hindering, or defrauding creditors, any conveyance made in furtherance of this compound object, was absolutely void, and they were left (as they were before they attempted the fraud) creditors without a security.

25 Va. 282, 1826 WL 1069 at *12. More recently Justice Compton on behalf of the Supreme Court of Virginia enunciated a concise but comprehensive summary of the Virginia law on this subject in the following passage:

> At common law and under Code § 55–80 ... an insolvent debtor may generally make a valid transfer of a portion or the whole of his assets to a bona fide creditor on account of an existing indebtedness, if that is the sole purpose of the debtor and the transfer is for full value. [citation omitted] This is true even though such transfer is intended by the debtor and creditor to give such creditor a preference to the exclusion of others in the distribution of the debtor's assets .... But if the purpose to make a bona

fide preference is merely incidental to the transaction and is used as a cloak for some other purpose which is fraudulent in actual intent, the transfer is invalid. In order to set aside a preference, the plaintiff must not only prove that the debtor intended to delay, hinder or defraud his other creditors, he must also show that the preferred creditor had notice of such intent. [citation omitted] Under the last sentence of the statute ... the transfer to an innocent grantee who has given value will be sustained. But proof of actual knowledge of the debtor-grantor's fraudulent intent is not necessary, it being sufficient to show that the grantee had "knowledge of such facts and circumstances as would have excited the suspicion of a man of ordinary care and prudence, and put him upon such inquiry as to the bona fides of the transaction as would necessarily have led to the discovery of the fraud of the grantor ...." [citation omitted]

*Bank of Commerce v. Rosemary and Thyme, Inc.*, 218 Va. 781, 784, 239 S.E.2d 909, 912 (1978).

■ Several years earlier Judge Dalton of the District Court of this District held that good faith on the part of a preferred creditor "cannot be said to be lacking unless the transferee knowingly participated in the debtor-transferor's purpose to defeat other creditors or lacked good faith in valuing the property exchanged." *In Re Decker*, 295 F.Supp. 501, 516 (W.D.Va. 1969), *aff'd, Woodson v. Gilmer*, 420 F.2d 378 (4th Cir.1970). The Supreme Court of Virginia stated in the case of *Willis v. The Blue Ridge Bank*, 153 Va. 392, 149 S.E. 624 (1929) that "the burden of showing value is upon the grantees when the grantor's fraudulent purpose has been made to appear." 153 Va. at 403, 149 S.E. 624. *See also Baldwin & Brown v. Winfree's Adm'r*, 116 Va. 16, 81 S.E. 36 (1914)("when

a prima facie case of fraud has been shown, the burden shifts, and the defendant must establish the bona fides of the transaction." 81 S.E. at 37, quoting from *Shoemaker v. Chapman Drug Co.*, 112 Va. 612, 72 S.E. 121); *accord, Hutcheson v. Savings Bank, supra,* 105 S.E. at 681. An intent to "hinder" or "delay" a creditor is sufficient to come within the statute although there is no intent ultimately to defraud the creditor. *Darden v. George G. Lee Co.*, 204 Va. 108, 129 S.E.2d 897 (1963); 9A Michie's Jurisprudence 16, Fraudulent and Voluntary Conveyances § 12 (1991).

## APPLICABLE TENNESSEE LAW

■ The exceeding fineness of the distinction between the right of a debtor to prefer one creditor over others, even if the inevitable effect of such preference is to delay or hinder other creditors, even when such consequence is known to both the debtor and the preferred creditor, and the right of a creditor to set aside a transfer which was intended to hinder or delay creditors when such intent was known to both the debtor and the preferred creditor, is illustrated by the following passage from a 1932 decision of the Court of Appeals of Tennessee quoting from a decision of the Supreme Court of Missouri, *Cole v. Cole*, 231 Mo. 236, 132 S.W. 734 (1910):

[A] wife may freely contract with her husband. That, if she be a bona fide creditor, her debt stands on as sure as that of any one else, he may prefer her, since those acts, as before, by securing her debts to the exclusion of others, existing or subsequent, notwithstanding she may have known of his indebtedness and insolvency, notwithstanding she knew that the fact of her preference would have the ultimate effect of hindering and delaying his other creditors, and notwithstanding the husband intended to

hinder and delay his creditors; all this, so long as (and provided always) she keep her hands clean by not participating in or becoming a party to his fraudulent intent. There is thin ice there, and one who walks thereon has need of great care.

*Hartnett v. Doyle*, 16 Tenn.App. 302, 64 S.W.2d 227, 231 (1932). A subsequent decision of the Supreme Court of Tennessee established the principle that even if there is no intention ultimately to defraud other creditors, an intent to hinder or delay them in the enforcement of their rights "is sufficient to avoid the mortgage." *M. & N. Freight Lines v. Kimbel Lines*, 180 Tenn. 1, 170 S.W.2d 186, 186–7 (1943).[3] *Accord, Klein v. Rossi*, 251 F.Supp. 1 (E.D.N.Y.1966) (New York Law).

■ On the other hand it has been held that the words "hinder" and "delay" must be "taken in their legal or technical, and not their literal sense", which means "an improper or illegal hindrance or delay-not such as is reasonable and fair in the exercise of the well established right to prefer creditors." *Hefner v. Metcalf*, 38 Tenn. 577, 1858 WL 2963 at *2 (1858).

■ In Tennessee, as in Virginia, it is necessary to avoid a fraudulent conveyance to establish that the grantee was apprised of the grantor's wrongful intent. "However fraudulent the purpose was, if the *cestui que trust* had no knowledge of it, and consequent participation in it, he could not be affected by it." *Trotter v. Watson*, 25 Tenn. 509, 514, 1846 WL 1460, 1846 Tenn. LEXIS 31, 6 Hum. 509 (1846). If the grantee be affected with that knowledge, however, even the payment of "a full price" will not save the transaction from being avoided for the benefit of the preju-

diced creditor(s). 25 Tenn. at 512, 1846 WL 1460. *Accord, Gemignani v. Partee*, 42 Tenn.App. 358, 302 S.W.2d 821, 828 (Tenn.App.1956).

### FINDINGS OF FACT

The Court has had some difficulty in determining to its satisfaction the critical aspects of what occurred between the Colemans and the Bank leading up to the granting of the January 18, 1995 deeds of trust. Mr. and Mrs. Coleman, as well as Mr. Belcher, are vitally interested in the outcome of the proceeding. Although Mr. Copeland is not interested in the same sense, he was not actually privy to the conversations between Mr. Coleman and Mr. Cook, on the one hand, and Mr. Belcher, on the other, regarding the offer of the deeds of trust to the Bank. Neither party introduced testimony from either Darrell Clark or his wife although they also granted deeds of trust to the Bank at the same general time as did the Colemans. Accordingly, the Court has reviewed carefully the trial transcript and all of the admitted exhibits in its effort to make the correct findings of fact and conclusions of law in a very close case.

The Court finds that the plaintiff, Molly Jane Coleman, did grant the deeds of trust to the Bank for the purpose of hindering the collection efforts of the IRS against unencumbered properties which she jointly owned with her husband and which, without some action on their part, would have been easy and tempting targets for such creditor. Her testimony on this point is uncontradicted and the Court, after hearing her testify and considering her demeanor, has found no reason to reject her claim. Indeed there is no testimony or other evidence to the effect that she per-

---

**3.** While this decision construed Tenn.Code section 7277 (now 66–3–308) rather than the statute relied on by the plaintiff in this case (66–3–301), the same principle would certainly be applicable as well to the latter statute.

sonally had knowledge of the Bank's request for additional collateral or of any effort to induce any action or forbearance on its part. Mr. Belcher affirmatively testified that he had no conversation with her whatsoever. The Court further finds that the IRS was a creditor of Mr. and Mrs. Coleman at the time the deeds of trust were granted and remains a creditor of at least Mrs. Coleman.

Mrs. Coleman was never personally obligated to the Bank and her personal assumption of liability upon her husband's debts to the Bank was not requested by the Bank or offered by her. Just as she was unaware of the Bank's concerns and its understanding of the existing circumstances, the Bank was not privy to the nature of the arguments made to her by Mr. Coleman to induce her signature to the deeds of trust. No wording of the deeds of trust gave notice to Mrs. Coleman that the Bank was going to rely upon the security of the deeds of trust to grant any consideration to her husband which otherwise it would have been unwilling to provide. On their face such deeds of trust only purported to secure existing loans which the Bank had previously extended to her husband without her involvement "together with any and all other indebtedness of Grantor [defined as both Mr. and Mrs. Coleman] to Beneficiary" under the Virginia deed of trust and "of the Grantors [again defined as Mr. and Mrs. Coleman] to Pikeville National Bank & Trust Company", under the Tennessee deed of trust. In short, then, the deeds of trust were given to secure Mr. Coleman's prior liabilities and any joint indebtedness of the Colemans to the Bank, although there has been no suggestion otherwise in the evidence that the Colemans had any joint indebtedness to the Bank at that time or contemplated incurring any in the future. There was no other agreement reached between the Bank *and Mrs. Coleman* in

which the former agreed to grant extensions of payment to her husband or agreed not to seek adequate protection payments or relief from the stay in the pending bankruptcy cases involving the companies owned by Mr. Coleman and Mr. Cook.

The Bank had requested collateral from Coleman and Cook to secure their previously unsecured lines of credit. There is no evidence that the Bank requested additional collateral for their existing secured obligations to induce its cooperation in the difficult circumstances which Mr. Coleman and Mr. Cook and their companies then found themselves. While the Bank may well have been more cooperative with Coleman and Cook in the bankruptcy cases as a result of having the benefit of the very good collateral which it presumed it had gained by virtue of the Colemans' and the Cooks' deeds of trust, the evidence did not disclose any specific act which it took or failed to take or consented to in specific reliance upon such deeds of trust. Furthermore, the Court has not discerned any evidence to the effect that the previously unsecured line of credit from the Bank to Mr. Coleman for which it did request collateral remains still owing to the Bank; no testimony to such effect was offered and the only proofs of claim filed by the Bank in Mr. Coleman's bankruptcy case related to the other two loans secured by the mining equipment. There appearing to the Court no particular reason why the Bank would file proofs of claim upon two of its secured claims and not upon a third, in the absence of any evidence that such third claim remains outstanding, the Court must presume and therefore find that it has been satisfied.

Despite Mr. Belcher's contentions at trial that he was unaware when the deeds of trust were granted that the Colemans, or either of them, had any motivation to hinder the collection efforts of the IRS, the

Court concludes that the combination of the statements contained in his December 9, 1994 memo, his responses to some very effective cross-examination conducted by Mr. Charles Keen, IRS counsel, at trial (T. 93–99), the apparent candor of his discovery deposition testimony, and the Court's own perception of his demeanor at trial, including seeming variations in his testimony there, causes it to find that he was aware that one of the motivating reasons for the granting of the January 18, 1995 deeds of trust was to hinder and/or delay the IRS's collection efforts to give the parties time to file amended tax returns and perhaps negotiate with the IRS, because otherwise "the I.R.S. would come in and levy on the property." (T. 30) Because Mr. Belcher was an officer of the Bank and its designated responsible person for the supervision of the Coleman and Cook loans, his knowledge must be deemed the knowledge of the Bank itself. Furthermore, the Court finds that the facts known to Mr. Belcher at the time, specifically, his knowledge of the Colemans' and Cooks' substantial personal tax liabilities, their joint and essentially contemporaneous offer to grant the Bank deeds of trust upon all of their unencumbered and valuable real estate, including but not limited to their personal residences, collateral which was far more desirable than the pledge of coal company stock which had previously been discussed by the parties, were sufficient to apprise an experienced banker such as Mr. Belcher that his customers wanted to protect themselves and their properties from the IRS. The Court further finds, however, that the Bank had its own legitimate business reasons for desiring and accepting additional collateral, that it was unaware that Mrs. Coleman's sole motivation was to put the property beyond the IRS's reach, and that it had no reason to doubt that the Colemans, given the time to file amended tax returns for the companies and take other actions as might be recommended to them, would ultimately be able to resolve their tax problems. The Court further finds that the Bank did not accept the deeds of trust simply to accommodate their customers to provide "safe keeping" for their unencumbered properties and thereby keep the IRS at bay. In short, the Court accepts the deposition testimony of Mr. Belcher that he understood that the Colemans had several reasons for offering the deeds of trust, one being "for permission to relocate the equipment" and another to keep the IRS from "levy[ing] on the property." (T. 29–30) Because the choice for the Court in making this finding of fact of Mr. Belcher's knowledge of the Colemans' intent to hinder and delay the IRS's collection efforts was whether to credit his deposition testimony as given or to accept his trial contention that his deposition testimony was based not just on what he knew at the time but also on what he later learned from the adversary proceeding filed against the Bank by Mr. Coleman, a contention which the Court did not find credible, the Court believes that such finding is justified under either the "preponderance of the evidence" standard or the higher "clear and convincing evidence" standard.

## CONCLUSIONS OF LAW

This Court has jurisdiction of this proceeding by virtue of the provisions of 28 U.S.C. §§ 1334(a) and 157(a) and the delegation made to this Court by Order from the District Court on July 24, 1984. This is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2)(H).

▆▆▆▆ The law in both Tennessee and Virginia appears to be in accord with the general principle stated in 37 Am.Jur.2d 698, Fraudulent Conveyances § 7 (1968):

If ... the intention to hinder and delay creditors is not only present in the mind of the debtor, but is also the object and constitutes a part of the cause for the execution of the conveyance, the transaction is void. Furthermore, this intention need not be the debtor's primary, active, controlling purpose; it is enough if it is one of the purposes which was entertained, either directly or as incidental to a more active purpose.

This quoted language was carried over from the original edition of American Jurisprudence (24 Am.Jur. 17) and was quoted with approval by the Supreme Court of Tennessee in the case of *M. & N. Freight Lines v. Kimbel Lines, Inc., supra,* 170 S.W.2d at 188. While the Court has not found a Virginia decision quoting this exact language, the Supreme Court of Virginia's decisions in the *Garland v. Rives, supra,* and *Bank of Commerce v. Rosemary and Thyme, Inc., supra,* cases certainly appear to be in accord with it. Therefore, based on the Court's finding of fact that the Bank, through its responsible officer, Mr. Belcher, was aware that one of the motivating reasons that caused the Colemans to offer the deeds of trust upon their valuable, unencumbered real property was to protect the same from IRS levy, it does not qualify as a bona fide purchaser and the deeds of trust are void as to the IRS. Because the Plaintiff as Debtor–in–Possession is entitled to exercise the rights of a bankruptcy trustee to enforce the rights of an actual creditor of the debtor by virtue of 11 U.S.C. § 544(b), the deeds of trust must be avoided for the benefit of the bankruptcy estate. 11 U.S.C. §§ 1107(a), 1106(a)(1), 704(2) and 541(a)(3); *Wellman v. Wellman,* 933 F.2d 215 (4th Cir.1991).

 Although both the Virginia and Tennessee statutes and the cases interpreting and applying them are quite clear that conveyances given to "hinder, delay or defraud creditors" and accepted with knowledge or notice of such intent are "void" as to the creditor(s) hindered, delayed or defrauded, they are not void as to the grantors thereof. The Virginia statute reads that such conveyances "shall, as to such creditors ... be void." The Tennessee statute reads that such conveyances "shall be deemed and taken, only as against the person ... whose debts, suits, demands, estates, or interest, by such guileful and covinous practices as aforementioned, shall or might be in any wise disturbed, hindered, delayed, or defrauded, to be clearly and utterly void". These provisions are in accord with the general, if not indeed universally accepted, principle that "[t]he fact that a conveyance or transfer of property may be fraudulent as to creditors of the transfers or as to third persons does not affect its validity as between the parties to the transaction." 37 Am Jur.2d 792, Fraudulent Conveyances § 111 (1968). "Thus, as between a fraudulent grantor and fraudulent grantee, it is the fraudulent grantee who is entitled to any excess in the property over and above the amount necessary to satisfy the creditors." 37 Am.Jur.2d at 792–93. *See also* 9A Michie's Jurisprudence 61–63, Fraudulent and Voluntary Conveyances § 43 (1991). Virginia's policy on this point is so strong that its highest court rejected a grantor's claim of his homestead exemption in property which he had conveyed in fraud of the rights of a jilted fiancee and while her breach of promise to marry suit was pending. *Burton v. Mill,* 78 Va. 468, 481–83, 1884 WL 4997 (1884). It is instructive to note that this same principle (*i.e.,* that fraudulent conveyances are upheld as between the parties) is demonstrated in the Bankruptcy Code. Specifically, 11 U.S.C. § 522(g) permits a debtor to exempt property which the Trustee recovers under various sections of the Code, including § 550, to the same extent as if

such property had not been transferred if "such transfer was not a voluntary transfer of such property by the debtor". Section 522(h) permits a debtor to avoid to the extent of his claimable exemption a transfer avoidable by the Trustee under § 544 (among other sections) even if the Trustee brings no avoidance action, provided that the debtor could have claimed the exemption under 11 U.S.C. § 522(g)(1), *i.e.*, the "transfer was not a voluntary transfer" and "the debtor did not conceal the property". In short, as applicable to the present controversy, a debtor will not be allowed to claim an exemption in bankruptcy in property which he attempted to transfer in fraud of his creditors. *See* 4 Collier on Bankruptcy § 522.08[1]-[3] at pages 522-36 thru -40 (15th edition revised).

▨ It is clear that the Debtor-in-Possession exercising the powers of a trustee in bankruptcy has to rely upon the existence of the IRS as the creditor whose collection efforts were hindered by the granting and recording of the two deeds of trust in order to challenge the deeds of trust. If that claim did not exist, there would be no right under the Virginia and Tennessee statutes relied upon by the Plaintiff to avoid such deeds of trust. Given the existence of that creditor, however, the transactions, once avoided, are avoided for the benefit of all creditors of the estate. *Moore v. Bay*, 284 U.S. 4, 52 S.Ct. 3, 76 L.Ed. 133 (1931) (Holmes, J.); *In re Moore*, 11 F.2d 62 (4th Cir.1926)(Parker, J.); *Matter of Leonard*, 125 F.3d 543 (7th Cir.1997); 9 Collier on Bankruptcy § 544.09[5] at page 544-21 (15th ed. rev.).

The Court also concludes that for fraudulent conveyance purposes no consideration passed from the Bank to Mrs. Coleman. This does not result from the fact that she was not liable on her husband's debts to the Bank, because the Bank's bargained-for-agreement to extend the time for her husband's repayment obligations clearly would have been sufficient consideration to support her conveyances had they otherwise been free from challenge. *See* 17A Am.Jur.2d 139, 142-44, 171-72, Contracts §§ 125, 128 and 156 (1991). The problem is that "[n]othing is consideration for a contract that is not accepted or regarded as such by both parties." 17A Am.Jur.2d 140, Contracts § 126 (1991). Under the evidence in this case, the Bank did not promise to Mrs. Coleman that it would do anything or forbear taking any action in exchange for her signing the deeds of trust. No such agreement was set forth in the documents themselves and no other evidence was offered to establish that the Bank reached any understanding with Mrs. Coleman which induced her to sign the deeds of trust. Even so, even if Mrs. Coleman had not granted the deeds of trust with the illegal intent to "hinder, delay or defraud creditors", she could not have successfully challenged the Virginia deed of trust at any rate because it was under seal, which *as between the parties* conclusively imports consideration with no evidence to the contrary being admissible in law or equity. *Hopkins v. Griffin*, 241 Va. 307, 402 S.E.2d 11, 13 (1991).

▨ This brings the Court to perhaps the most difficult issue posed by this adversary proceeding and indeed by the principal motivation of the bankruptcy case itself, that is to "save" the Debtor's property insofar as possible for her personal benefit free of the encumbrance which she reluctantly but ultimately willingly granted in 1995. There is not a great deal of authority dealing with the issue of transfers avoided pursuant to § 544(b) of the Code which have value in excess of the obligations to creditors, very likely because bankruptcy cases which pay the creditors in full are infrequent occur-

rences, but there are some pertinent cases, one of the most prominent of which is from the Court of Appeals of this (Fourth) Circuit. This opinion will undertake to review that authority.

The preeminent general bankruptcy treatise, Collier on Bankruptcy, introduces the issue of the extent to which a transfer avoidable under § 544(b) is avoided with the following sentence, "as under *Moore v. Bay,* the entire transfer is avoided *to the extent necessary to benefit the estate.*" 5 Collier on Bankruptcy § 544.09[5] at page 544–21, *supra,* (emphasis added). Support for this proposition is suggested first in chronological terms by an opinion authored by Judge Chase of the Second Circuit on behalf of a stellar panel of that court consisting of himself, Judge Learned Hand and Judge Augustus Hand in the following passage:

> A debtor in possession holds its powers in trust for the benefit of the creditors.... If in the unlikely event that, after creditors have been satisfied accordingly, some of the mortgaged property should be left unaffected by the plan and some part of the debt due the partnership should remain as an obligation of the debtor, whatever security the partnership may have under the mortgage is left for determination when, and if, that question may be presented.

*In re Martin Custom Made Tires Corporation,* 108 F.2d 172, 173 (2nd Cir.1939). The principle foreshadowed by that passage was made explicit in a later Second Circuit opinion authored by Judge Augustus Hand dealing with a situation where a reorganized debtor-in-possession which had reached agreement with its creditors sought to avoid a creditor's lien through use of the trustee's "strong arm powers":

> The debtor never contributed or offered to contribute this value to the plan and now seeks to obtain it purely for its own

benefit. This we think it cannot do. In our opinion the bank, *which had a good secured claim as against the debtor,* can still hold it where the petition to avoid the sale is not in the interest of the general creditors. (emphasis added)

*Whiteford Plastics Co. v. Chase National Bank,* 179 F.2d 582, 584 (2nd Cir.1950). This same principle was emphatically reaffirmed by the Second Circuit in the case of *Matter of Vintero Corporation,* 735 F.2d 740(2nd Cir.1984):

> Vintero was given the right to avoid CVF's security interest in order to protect such third parties, not to create a windfall for Vintero itself .... To the extent that other creditors of Vintero are not affected adversely by enforcement of GVF's security interest, there is no reason why such security interest should not be enforced.

735 F.2d at 742.

In a 1991 opinion the Fourth Circuit Court dealt with a novel situation where an individual debtor-in-possession had reached agreement with all of his creditors to satisfy their claims substantially with cash and partly with some non-recourse notes aggregating $600,000 which were payable solely out of the proceeds of a fraudulent conveyance adversary proceeding he brought and over which he maintained essentially full control. After reaching this settlement over $2 million in excess funds were distributed from the bankruptcy estate to the debtor personally. The Court held that "a debtor-in-possession of a bankruptcy estate cannot maintain an avoidance action under § 548 unless the estate would be benefitted by a recovery of the transferred property." *Wellman v. Wellman,* 933 F.2d 215, 218 (4th Cir.1991). Although creditors would have received $600,000 from a successful suit, the Court concluded that the creditors would have accepted the cash alone in

settlement of their claims and affirmed the District Court's ruling that the debtor had "executed the non-recourse notes to the creditors in an attempt to create a claim in the estate so that he could obtain a 'massive surplus recovery' for himself in addition to the surplus distributed to him." 933 F.2d at 219. As a result, the adversary proceeding was dismissed.

Although the Fourth Circuit does not appear to have revisited the issue, two opinions of the Bankruptcy Court for the District of Maryland have. These opinions have taken a more liberal approach and appear to attempt to limit the *Wellman* decision to its particular facts and holding. Specifically, *In re Greenbelt Co–op, Inc.*, 124 B.R. 465 (Bankr.D.Md.1991) held that creditors need not be directly benefitted by a lien avoidance action where they will receive some benefit, such as improvement of the debtor's financial health and therefore its ability to meet its obligations under the confirmed plan. 124 B.R. at 472–74. Accordingly, the lien was entirely avoided and the continuing reorganized debtor was enabled to retain the property free and clear of the avoided lien. This approach was upheld in the subsequent opinion of *In re Glanz*, 205 B.R. 750 (Bankr.D.Md.1997). Although that opinion held that the facts of its case came with the *Greenbelt Co–op* ruling, it also held that the *Wellman* opinion applies only to actions under Code § 550 to recover an avoided transfer "for the benefit of the estate" and not to situations where the avoidance of a transfer is effective on its own without having to file an action to recover under § 550, 205 B.R. at 757–58. While such a distinction, if proper, would be applicable to the facts of this case where avoiding the liens of the deeds of trust under § 544(b) would simply eliminate the encumbrances upon the title to the properties which the Colemans continue to retain without the necessity of having

to utilize the recovery remedy of § 550, this Court questions the validity of such distinction because it would apply the *Wellman* decision to an absolute deed in fraud of creditors but not to a deed of trust given with the same intent. On policy and consistency grounds at least, such a difference in result seems to lack merit. Indeed, the *Glanz* opinion itself gives evidence of backing away from the implications of such a distinction by going on to recognize that equitable principles "may be applied to bar a lien avoidance action when the avoidance does not accrue to the benefit of creditors but instead creates a windfall for the debtor." 205 B.R. at 758. While each of the *Wellman*, *Greenbelt Co–op* and *Glanz* opinions either bars the avoidance action absolutely or permits its enforcement fully despite collateral benefits to the debtor, the Court does not believe they preclude the possibility in a proper case of a partial avoidance of a transfer insofar as it may be necessary to benefit the bankruptcy estate in accordance with the Second Circuit line of authority.

The final case discovered by the Court on this general theme is *In re Cybergenics Corporation*, 226 F.3d 237 (3d Cir.2000), authored by Circuit Judge Rendell, who the Court understands to be a former bankruptcy judge. That case considered a complaint brought on behalf of the bankruptcy estate by the unsecured creditors committee alleging that certain transfers made and obligations incurred in connection with a leveraged buyout were constructively fraudulent. This District Court had dismissed the complaint on the ground that the fraudulent conveyance action had passed to a third party when it bought all of the debtor's assets. The Third Circuit reversed in an opinion which carefully examined the purpose and intended scope of avoidance actions authorized by the Bank-

ruptcy Code. It specifically held that a § 544(b) avoidance action is an asset of the bankruptcy estate for the benefit of the creditors and not an asset of the debtor personally. The following language is pertinent to consideration of the issues presented in the case before this Court:

> The power to avoid the debtor's prepetition transfers and obligations ... is no more an asset of ... [the] debtor in possession that it would be the personal asset of a trustee, had one been appointed in this case. Much like a public official has certain powers upon taking office as a means to carry out the functions bestowed by virtue of the office or public trust, the debtor in possession is similarly endowed to bring certain claims on behalf of, and for the benefit of, all creditors.
>
> . . . .
>
> Rather than improving the debtor's own bottom line, empowering the trustee or debtor in possession to avoid a transaction by pursuing an individual creditor's cause of action is a method of forcing that creditor to share its valuable right with other unsecured creditors.

226 F.3d at 243–44.

> The trustee's power to assert a creditor's state law fraudulent transfer action through section 544(b) stands in sharp contrast to other statutory entitlements in the Bankruptcy Code that do work to the direct benefit of the debtor, not the creditors. One prime example is section 522(f) of the Bankruptcy Code, which permits an individual debtor to avoid certain liens on household goods to the extent that they impair the debtor's property exemption. While debtor protection is the express goal of provisions such as section 522(f), bolstering creditors' rights is the primary objective of avoidance powers such as section 544(b). *See* Thomas H. Jackson, Avoiding Pow-

ers in Bankruptcy, 36 STAN. L. REV. 725, 730 n. 16 (1984).

226 F.3d at 244, n. 9.

The Court concludes that the 1995 deeds of trust should be avoided to the extent necessary to pay the valid claims of the IRS and Mrs. Coleman's other creditors as well as any deficiency in the bankruptcy estate to pay the administrative expenses of the estate, including such fees as may be allowed by the Court to counsel for the Debtor–in–Possession for his services of benefit to the estate and its creditors, but that they (*i.e.*, the deeds of trust) should otherwise be left in effect for the benefit of the Bank as to any remaining surplus value of the properties they encumber. The Court believes that this result most effectively upholds the policies and specific statutory provisions of the Bankruptcy Code and the laws of Virginia and Tennessee to avoid voluntary fraudulent transfers where the rights of third parties are concerned, but to uphold and enforce them as between the parties themselves.

An order in accordance with this memorandum opinion shall be entered contemporaneously with the signing hereof below. In a separate opinion the Court will grant the Bank's motion to reconsider its order of March 21, 2002 confirming the Debtor's Plan and will rescind such order and deny confirmation of such Plan which would have permitted the Debtor under certain circumstances to retain her properties free and clear of the 1995 deeds of trust which she willingly granted.

The Clerk is directed to send copies of this Memorandum Opinion to the Debtor, counsel for the parties and the Office of the United States Trustee.